**DELTA INVESTING CORPORATION, Plaintiff-Appellant,**

v.

**Elmer C. MOORE, Defendant-Appellee.**

No. 16493.

United States Court of Appeals
Sixth Circuit.

Sept. 2, 1966.

W. Keith McCord, Knoxville, Tenn., Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., of counsel, for appellant.

James H. Jarvis, Knoxville, Tenn., O'Neil, Jarvis, Parker & Williamson, Knoxville, Tenn., of counsel, for appellee.

Before EDWARDS, Circuit Judge, and CECIL and McALLISTER, Senior Circuit Judges.

McALLISTER, Senior Circuit Judge.

Plaintiff-appellant, Delta Investing Corporation, filed its complaint against defendant-appellee, Elmer C. Moore, for judgment in the amount of $74,000, represented by fifty promissory notes executed by Mr. Moore, payable to plaintiff-appellant in consideration of an assignment to him of a leasehold interest owned by Delta in the Marion E. Taylor Building in Louisville, Kentucky. All of the notes except two were in the amount of $750; one of the remaining two was in the amount of approximately $7,000, and the other, in the amount of approximately $31,000, making the total of $74,000. In addition to the notes, Mr. Moore, as part of the consideration, paid $1,000 to Delta at the time of the assignment of the lease to him.

The district court, in its opinion, found that Delta induced Mr. Moore to enter the transaction by means of fraudulent representations; that the agreement should be rescinded; that the notes should be cancelled; and that Mr. Moore was entitled to recover the sum of $1,000 which he had made as a down payment. In a subsequent memorandum and order, the court modified its prior opinion as to the $1,000 down payment, holding that, because Mr. Moore could not return the lease to Delta, he was not in a position to restore the status quo, and was, therefore, not entitled to recover the down payment. The court, therefore, entered a judgment, cancelling the notes in the aggregate amount of $74,000, but denying Mr. Moore recovery of the sum of the down payment of $1,000. From the judgment, plaintiff, Delta Investing Corporation, appeals.

Delta Investing Corporation is a company with offices in New York City, primarily engaged in extensive dealings in real estate. Defendant-appellee, Elmer C. Moore, was, on the date of the transaction here involved, a shop foreman at the Blue Ridge Transportation Company, a trucking firm in Knoxville, Tennessee, owned and operated by his brother, and his duties there were to take care of the equipment. He was raised on a farm in Tennessee, and had a twelfth-grade education, but, as the court found on the trial of this case, was, in business affairs, an unlearned and inexperienced person.

One of the properties of appellant, Delta Investing Corporation, was the leasehold interest in the Marion E. Taylor Building, above mentioned. This was an office and business building consisting of eight stories, occupied by what are described as miscellaneous tenants common to such buildings.

In early 1963, Delta decided to dispose of its interest in the Marion E. Taylor Building and, accordingly, listed it with various real estate brokers, one of whom was Saul Siegel, of New York City, who had had various real estate dealings with appellee.

The unusual or rather bizarre nature of Mr. Moore's dealings is illustrated by the fact that while he was shop foreman at his brother's trucking firm, he had owned a bottling plant in Asheville, North Carolina, a 60-lane bowling alley in Philadelphia, Pennsylvania, the Alcazar Hotel in Miami, Florida, a 250-room hotel on Biscayne Boulevard, and bottling plants in Knoxville, Tennessee, and Columbus, Mississippi; and that while he was negotiating for the leasehold of the Marion E. Taylor Building, he was also negotiating for the purchase of a chain of seventeen hotels. In spite of

what sounds like vast interests, his financial stakes in these transactions must have been minuscule. In all of these dealings, his total investment was $3,500. It would take more time to go into these matters than is possible in an opinion. Appellant, referring to them, states, without any sense of mystery or bewilderment, that "Primarily his business history was that of trading properties for profit rather than operating them for their income-producing character." He never realized any profit on any of these so-called business ventures, and ended up completely insolvent. How and why a person of small means gets entangled in what appears, on the surface, to be enterprises of great pitch and moment, is obscure.

Prior to the listing of the Marion E. Taylor Building by Delta, Mr. Siegel had dealings with Mr. Moore on some of the above mentioned transactions. During a meeting with Mr. Siegel in January or February, 1963, Mr. Moore expressed an interest in the Taylor Building and was given a flysheet on the building by Mr. Siegel. The flysheet showed that for the fiscal year of 1962, the building showed a net profit of $16,310.43, and a gross annual profit of $30,250. Thereafter, Mr. Moore also discussed the matter with the Delta officials. On March 31, 1963, Mr. Siegel mailed Mr. Moore a rent roll for January, 1963, and a profit and loss statement on the building for the fiscal year ending July 31, 1962. The rent roll included the name of each tenant, the expiration date of each lease, and showed a rental income of $289,475.21 for the fiscal year ending July 31, 1962, or an average monthly rental of $24,122.91.

As of the date of the closing of the contract on September 18, 1963, Delta gave Mr. Moore a rent roll for October of 1963; and it is undisputed that the last rent roll gave a substantially different picture of the rentals and tenants than appeared in the other three statements that appellant had theretofore given Mr. Moore.

The district court, in its opinion, outlined the principal claims of the parties and stated that Mr. Moore claimed that the representatives of Delta told him that the lease on the building was making money over and above the ground rent, taxes, and operating expenses; that Mr. Moore believed the statements of such representatives, to this effect, to be true; and that this was an inducement for him to execute the notes in consideration for the assignment of the lease. The court further recited that Delta denied that any such statements were made; that Mr. Moore was told that the lease was not making money; and that he stated to the representatives of Delta that he knew it was not making money, but that he would reduce expenses when he took possession of the property, and would see that the lease did make money for him.

The court then referred to the testimony of Mrs. Marjorie W. Ruka, the representative of the superintendent of the Marion E. Taylor Building, who handled and collected the rentals, and stated that her testimony and the exhibits introduced showed, beyond question, that, beginning in October, 1962, and ending in October, 1963, except for one or two months, the Marion E. Taylor Building did not produce enough rent to pay the operating expenses, the ground rental which amounted to approximately $159,300 per year, and the real estate taxes which amounted to $25,804 per year. The court declared that these exhibits showed that Delta was losing money during this period; that although the testimony showed that the building had made money during the fiscal year of 1962, nevertheless, before Mr. Moore attempted to take possession of the property, Delta had lost its best tenant, the Bon Marche Shop, and was about to lose another, Kay Jewelers; and that the loss of these tenants was the cause, or the primary cause, for the building's losing money for some twelve months prior to the time Delta assigned the lease to Mr. Moore.

While Delta stated that Mr. Moore was told about the loss of these tenants and, in addition, that he had observed the Bon Marche vacancy when he subsequently visited the building in Louisville, Mr. Moore testified that he knew nothing about the loss of this tenant, and did not know that the jewelry concern had been paying less rent than it had agreed to pay, and that it was on shaky financial ground.

During all of the negotiations with Delta in 1963 and before he purchased the assignment of the lease, Mr. Moore never went to Louisville, Kentucky, to examine the building, and between September 18, 1963, when he secured the assignment of the lease, to October 1, 1963, he did not visit Louisville nor ascertain the existence of any facts or conditions which would acquaint him with the operation of the building. On October 1, 1963, Mr. Moore visited the office of John M. Hennessy & Son, Inc., the managing agent for the Taylor Building, and gave the lease assignment to an official of the agency, directing him to have it recorded at the county courthouse. He then hired the Hennessy firm to be his managing agent for the building and demanded the October rent. He was advised by the firm that it would be several days before the October rentals were collected. On October 2, 1963, Benjamin Kaufman, agent for the owners of the building, notified Mr. Moore that he had defaulted in the payment of the October ground rental for the building. Mr. Moore testified that Mr. Kaufman would not let the Hennessy agency pay him the rentals. There was some difficulty with regard to the recording of the lease. Before Mr. Moore could secure the payment of any of the rentals from the tenants of the building, the owner cancelled the lease. He found that the rentals from tenants would not even approximately pay the ground rentals and other charges which the owner of the leasehold interest was obligated to pay. Mr. Hennessy, in charge of the collection of rentals, informed Mr. Moore that the Taylor Building, as a rental proposition, was losing between $1,000 and $2,000 a month. Mr. Moore called the President of Delta, telling him of the situation and informing him that he had received notice from the representative of the owner of the building that unless the ground rents were paid by October 12, the owner would cancel the lease. The President of Delta washed his hands of the transaction. On October 14, 1963, Mr. Moore served a notice on Delta which we read as a notice of rescission of the lease. Later, the President of Delta told Mr. Moore that Delta was going to hold him responsible for the payment of the notes inasmuch as it had transferred the lease to him, and that upon its cancellation, Delta had lost its interest in the real estate. Mr. Moore took this matter up with Mr. Kaufman, the representative of the owner of the building, and told him what the President of Delta had said. In response, Mr. Kaufman told Mr. Moore that any time Delta paid the rentals and liens on the property, they could have the lease back; and Mr. Moore so informed the President of Delta the latter part of October. For some reason, which appellant was unable to explain, Delta, instead of taking up the lease again and continuing as the owner of the leasehold interest, sued Mr. Moore for the $74,000 due on the notes.

Mr. Moore originally filed a counterclaim to Delta's complaint, alleging illegality of the assignment and seeking a return of his down payment of $1,000. However, at the hearing, it soon developed that what he was seeking was to establish material misrepresentation and fraud in the inducement for him to enter upon the contract. Ultimately, the case was tried on that basis, and no point is now made of any deficiency in the pleadings. They can be treated as having been amended to conform to the proofs in this regard.

The court found, from the evidence, that misrepresentations were knowingly made by representatives of Delta to Mr. Moore to the effect that the Marion

E. Taylor Building was making money, and had been making money some several months prior to the time the assignment of the lease was executed, and had represented to Mr. Moore that if he acquired the lease, he would secure a sufficient amount of money from the tenants of the building to pay the ground rental, the real estate taxes, and all of the operating expenses, and have enough left over to meet the payments provided for in the notes. The court concluded that these representations by Delta were statements made by the company to Mr. Moore with the purpose of inducing him to sign the notes as consideration for the assignment of the lease to him, and that he acted on the belief that such representations were true. The court found as a fact that such representations were not true; that they constituted fraud and deceit; and were grounds for the rescission of the contract by Mr. Moore. The court observed that, in a case where both parties have equal knowledge of matters misrepresented, equity is not inclined to relieve against false representation; but that Mr. Moore did not have such equal knowledge as to the matters misrepresented; that he asked for the operating statements on the building for several months preceding the date of the assignment of the lease, but that he was never able to get them; and that he was an unlearned and inexperienced person in business affairs, whereas the representatives of the appellant were experts in the real estate field and possessed knowledge in that field which greatly exceeded the little knowledge of Mr. Moore in this area. By reason of his findings that Delta had made these inducing misrepresentations, the court held that Mr. Moore was entitled to rescind the assignment of the lease and entitled to have the notes that he signed in the transaction cancelled.

■ On a review of the record, we are of the opinion that the findings of fact of the district court are amply sustained by the evidence. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 52 of the Federal Rules of Civil Procedure. The findings of fact in this case are not clearly erroneous.

Appellant asked for rescission of the contract on the ground that he was induced to enter into it by appellant's fraudulent misrepresentation. It is contended by appellant that Mr. Moore could not rescind the contract without tendering back to Delta what he had received and thereby returning appellant to the status quo.

■ While the general rule is that a party seeking to rescind must restore, or offer to restore, the consideration, or whatever he has received under the contract, the rule is not absolute, and shall not be strictly construed where restoration is impossible; but it is to be applied in accordance with equitable principles. The general rule is well stated in 17A C.J.S. Contracts § 439.

In Rhoads v. Leonard, 113 F.Supp. 411, 414 (D.C.W.D.Okla.), the court said:

> "This Court recognizes that generally in order to rescind a contract the parties must be returned to their original positions and that the one seeking such rescission must not only rescind promptly upon discovering that a fraud was perpetrated but must return or tender the consideration received.

> "Obviously, in the instant case, a return of the consideration by the plaintiff is impossible. The mortgagees have foreclosed their mortgages on the equipment in question. However, the Court believes the facts in the case at bar justify an application of an exception to the general rule of law regarding rescissions.

> "The plaintiff acted as promptly as the case would permit upon discovering the extent of the defendant's misrepresentations and made every effort to make her position clear to the de-

fendant and to enable the defendant to act swiftly and avoid loss. The plaintiff should not now lose the money given by her in good faith to the defendant for his supposed equity in the equipment for the sole reason that the equipment cannot be returned to the defendant *inasmuch as the conduct of the defendant was directly responsible for plaintiff's inability to return the subject matter of the rescinded contract*.

"In 12 Am.Jur. § 453, p. 1035, the exception to the general rule is phrased:

"'* * * Moreover, the return of the consideration is unnecessary where such return is rendered impossible by the party whose conduct affords ground for rescission. * * *'

"California implied a recognition of this exception to the general rule in Locke-Paddon v. Locke-Paddon, when the court in syllabus No. 6 said:

"'Rescission of a contract on ground of fraud will not always be denied merely because parties cannot be placed in statu quo.' [1924, 194 Cal. 73, 227 P. 715]

"In Harvey v. Thomas [1931, 150 Okl. 106, 300 P. 772] the Oklahoma court accurately stated this logical principle when in the first syllabus the Court said:

"'In order to rescind a contract for fraud, the party defrauded must as a general rule restore, or offer to restore, the consideration which he has received under the contract, *but if the defrauded person, by reason of the wrongful conduct of the wrongdoer, is rendered incapable of fully restoring the latter to his former position, such restoration to that extent is not necessary to a rescission.*' (Emphasis supplied.)

"In the instant case the defendant's conduct unmistakably brought about the condition whereby the plaintiff is unable to return the consideration of the contract in question.

"Patently, rescission appears harsh in the case at bar inasmuch as the defendant cannot possibly be returned to the position occupied by him prior to the agreement in question. Although the Court frowns upon a situation where the rescission of a contract leaves one party, the defendant in this case, in a position of great loss, such a disposition is proper under the presented facts. Certainly, the plaintiff should not suffer for a loss brought on directly by the defendant's fraudulent misrepresentations and actions."

In Stanard Tilton Milling Co. v. Mixon, 243 Ala. 309, 9 So.2d 911, the court said:

"While generally a party rescinding a contract for fraud is under a duty to restore the benefits received under the contract before he can rescind, he does not have to do so where the consideration received is without value, or where it is impossible, impractical, or futile to restore the consideration."

In Dermott Land & Lumber Co. v. Walter A. Zelnicker Supply Co., 271 F. 918, 920 (C.C.A.8), the court said:

"The rule that the party who seeks to rescind a contract shall return whatever he has received thereunder, like other rules of justice must be so applied in the practical administration of justice as shall best subserve in each particular case the undoing of wrong and the vindication of right."

In the instant case, Mr. Moore discovered almost immediately after he had secured the assignment of the leasehold interest that instead of making a considerable profit each month after deducting expenses from rentals, as was represented to him by Delta, the Marion E. Taylor Building was, on the foregoing basis, losing between $1,000 and $2,000 a month. He notified Delta as soon as he learned what the situation was and informed them he would pay no more on the contract; and, moreover, when Delta told him that it would hold him liable on the notes, inasmuch as they had lost their leasehold interest

when the owner cancelled it for Mr. Moore's nonpayment of the October 1963 rent, Mr. Moore called Mr. Kaufman, representing the owner of the property, and told him what Delta had said, whereupon Mr. Kaufman informed Mr. Moore that Delta could continue its ownership of the leasehold if it would pay the rent and charges included in the instrument of lease. This was communicated at once to Delta by Mr. Moore. Instead of availing themselves of this opportunity of again acquiring the leasehold interest and continuing it, Delta ignored it and, instead, sued Mr. Moore for $74,000 represented by the notes.

Mr. Moore never received any rentals; he received nothing from Delta of any value; the leasehold was not only of no value but constituted only an increasing monthly indebtedness. There were no benefits to be restored by Mr. Moore for he had received none. Restoration is not required as a condition of rescission when such restoration is impossible, impractical, or futile. The leasehold interest was cancelled on October 12, 1963, because Mr. Moore had no money to pay the ground rental, and had relied upon appellant's representations that the rentals collected from tenants would enable him to make such ground rental payments. When Delta had the opportunity of having the leasehold interest returned to it, the company, in effect, refused to accept it, or, as was well said on the argument of the case, "simply desired to walk away from a lease which it knew was a totally losing proposition." Mr. Moore was, therefore, entitled to rescind, under the circumstances of this case, without any offer or showing of restoration by him of the status quo.

The district court, in a preliminary opinion, had found that Mr. Moore was, because of the fraud practiced upon him, entitled to rescission, cancellation of the notes, and return of his down payment of $1,000. However, in an amended opinion, the court found that, because Mr. Moore was not able to return the lease to Delta and thus restore the status quo, he was not entitled to rescis-sion and recovery of his down payment. Accordingly, the court ordered cancellation of the notes on the ground of Delta's misrepresentation, but denied recovery of the down payment of $1,000 made by Mr. Moore.

As far as cancellation of the notes goes, it could be sustained on the theory of rescission, as we see it, or, since the leasehold interest was of no value but only an encumbrance—a total loss—the cancellation of the notes was justified for failure of consideration.

If the contract were rescinded, there would arise the question of appellee's right to the return of the down payment of $1,000. However, Mr. Moore did not appeal from the holding denying recovery thereof; and no claim is made here in this regard.

In accordance with the foregoing, the judgment of the district court is affirmed.