461 P.2d 161

**Clairbel L. JENNINGS, a widow, Appellant,**

**v.**

**Bill LEE and Herlinda Lee, husband and wife; Carl O. Mosier, dba Mosier Realty; Elliott Holding Company, an Arizona corporation; Jack Kelman and Alice Kelman, husband and wife; and Abe Kelman and Libbie Kelman, husband and wife, Appellees.**

**No. 9658.**

Supreme Court of Arizona.

In Banc.

Nov. 14, 1969.

Rehearing Denied Dec. 16, 1969.

Carl Tenney, Phoenix, for appellant.

Lester J. Hayt, Phoenix, for appellees Lee.

Rawlins, Ellis, Burrus & Kiewit, by Norman D. Hall, Jr., Phoenix, for appellee Mosier.

Burton & Weeks, by Mark Leibsohn and Phillip Weeks, Phoenix, for appellees Elliott Holding Co. and the Kelmans.

LOCKWOOD, Vice Chief Justice.

Plaintiff, Clairbel Jennings, a widow, brought suit to rescind, on the grounds of fraud, a real estate transaction in which she traded approximately thirty-seven acres located at 24th and Southern Streets in Phoenix, Arizona, for the Glen Canyon Steak House located in Page, Arizona. Defendants were Bill Lee, the lessee of the restaurant, Elliott Holding Company, the owner of the restaurant, Jack Kelman, the president of Elliott Holding Company, and Carl Mosier, a real estate broker who arranged the trade.

In the early part of 1959 Bill Lee purchased from the United States government three vacant lots in Page, Arizona. He constructed the Glen Canyon Steak House on the land and operated it from 1962 to July 1, 1963. At that time Lee entered into an agreement with Jack Kelman whereby he sold the restaurant to Elliott Holding Company for $200,000.00. Elliott paid $80,000.00 in cash and borrowed the remaining $120,000.00 from Associated Mortgage and Investment Company, giving them a first mortgage on the steak house. Con-

current with this transaction Lee and Kelman, as president of Elliott, entered into a separate agreement whereby Elliott leased the restaurant back to Lee for $2,000.00 per month with an option to buy within five years for $250,000.00.

After operating the restaurant for about five months under this arrangement, Lee began to fall behind in his rental payments to Elliott. In an attempt to solve the problem Lee and Kelman modified the original lease so that Lee was obligated to pay $1,500.00 per month during the slow winter months and $2,500.00 during the summer tourist season. Evidently this solution proved ineffective, for by June, 1964, Lee had fallen $6,000.00 in arrears in the rent. At this juncture Lee went to Kelman and, although he was only the lessee and not the owner, told Kelman that he was looking for a buyer for the restaurant. Whereupon, according to Lee's testimony, Kelman agreed to allow him to exercise the option for a lesser sum. Pursuant to this understanding Kelman entered into an agreement with Lee (evidenced by a "scrap of paper" which Kelman has since misplaced) which provided that Lee could repurchase the restaurant for $70,000.00 plus assumption of the remainder of Elliott's $120,000.00 mortgage to Associated. (Approximately $110,000.00 remained on the mortgage so this modification reduced the total purchase price from $250,000.00 to $180,000.00.)

Sometime during the early part of 1964 the plaintiff informed defendant Mosier that she was interested in acquiring some income-producing property, since the rents derived from her property at Southern and 24th Streets in Phoenix were insufficient to maintain her. Mosier had been a friend of the family for several years prior to this time, and the relationship between him and Mrs. Jennings was more confidential than that which normally exists between a real estate broker and a client. In August, 1964, Mosier travelled to Page, Arizona, to check on the Glen Canyon Steak House as a possible investment for Mrs. Jennings. After viewing it himself, he recommended it to Mrs. Jennings, and on September 17, 1964, drove her to Page to inspect the property. Mrs. Jennings felt that the restaurant might be a good prospect but had reservations about her ability to operate this type of business. Approximately a week after their trip to Page, Mosier called Mrs. Jennings into his office and showed her a purported monthly breakdown of the business done by the restaurant from January through August of 1964. This document showed an operating profit, before depreciation, of some $83,000.00, a figure which was nearly five times the actual profit during that period. While this operating statement bore Bill Lee's signature, Mosier testified that he did not know who gave it to him. Lee testified that the signature didn't look like his, and that he had never seen the statement prior to the lawsuit. There is no dispute as to the inaccuracy of the statement. As far as the record shows this was the only financial statement of any type ever shown to Mrs. Jennings during the course of the transaction.

After a second trip to Page on October 3, 1964, Mrs. Jennings still expressed some concern that she couldn't handle the business. Both Lee and Mosier assured her that the restaurant had good potential, and that they would help her with the business in any way they could. Mrs. Jennings asked Mosier if he didn't think it would be a good idea to have her lawyer check over the transaction. Mosier replied that it was up to her, but that things were going very smoothly and the inclusion of a lawyer in the negotiations would just be another expense.

On October 6, 1964, Mrs. Jennings signed escrow instructions prepared at Mosier's request by Phoenix Title & Trust Company. This escrow contained two conditions: (1) that Lee exercise his option and obtain title to the restaurant from Elliott Holding Company; (2) that Lee obtain by December 1, 1964, a loan on Mrs. Jennings' Phoenix property in the amount of at least $120,000.00. In the latter part of November, 1964, Kelman and Lee visited

the Jennings property in Phoenix. Subsequent to this inspection Kelman further modified the terms by which Lee could repurchase the restaurant. Under this modification Lee could gain title to the restaurant by (1) paying Kelman $35,000.00 in cash (instead of the original $70,000.00) (2) giving him a note for $35,000.00 secured by a second mortgage on the Jennings property, and (3) assuming the remainder of the $120,000.00 first mortgage on the restaurant. In connection with the second condition of the escrow, Lee obtained a loan of $85,000.00 from Gibralter Savings & Loan, which, along with the $35,000.00 loan from Kelman, fulfilled the requirement of $120,000.00 indebtedness on the Jennings property.

Although Lee had not completed these financial arrangements by the deadline of December 1, 1964, Mosier nevertheless phoned Mrs. Jennings on December 4, 1964, and told her that all the terms had been complied with, and she was now the owner of the steak house. Mrs. Jennings hired a couple to manage the business and took possession in the middle of December. After operating the restaurant for about two months she realized that the volume of business did not gibe with the operating statement which Mosier had showed her. Convinced that she had been fraudulently induced to trade her property for the restaurant, she filed suit for rescission, discontinued the business, and "winterized" the premises.

The case was heard by a court in equity sitting with an advisory jury. Before submitting the case to the jury, the court dismissed the action as to Kelman and Elliott Holding Company. The jury then found in favor of Lee and against Mosier. However, the Court disregarded the jury's finding in regard to Mosier and ordered judgment in his favor.

Mrs. Jennings urges that her assent to this trade agreement was obtained by the fraudulent misrepresentation of Mosier, who was acting as agent for both her and Lee in this transaction, and that the lower court, therefore, erred in refusing to grant rescission of the contract. Lee contravenes this position on two bases: (1) Mrs. Jennings cannot maintain a suit for rescission grounded on fraud, because she saw other figures on the operation of the steak house besides the false income sheet; and (2) Even if she could show that she relied solely on the false income statement, Mosier was acting as her agent, not Lee's, in presenting it to her.

Our resolution of these questions is complicated by the trial judge's unfortunate decision to adopt as his findings of fact those submitted by Kelman and Elliott Holding Company. Since the findings of fact are nearly barren as to the roles of Mosier and Lee in the disputed transaction, we must glean our information from the transcripts before us.

The law in Arizona is well-settled in regard to what elements must be shown to establish fraudulent misrepresentation:

"* * * (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury." Carrel v. Lux, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966).

■ Lee argues that besides the false operating statement, Exhibit 8, Mrs. Jennings also was shown two copies of an accurate operating statement for the same period of time, Exhibits 14 and 15. Consequently, she had no right to rely on the false operating statement. Mrs. Jennings testified that she had never seen either 14 or 15 prior to the taking of her deposition. Moreover, Mosier is very vague in his testimony as to when Mrs. Jennings allegedly was shown Exhibit 14 and admits that, although he had the accurate income figures, he never discussed these with Mrs. Jennings:

"Q. * * * Is it not true that until just a few moments ago you consistently

testified that you did not know when Mrs. Jennings had ever seen Exhibit 14, except that you believed it to be sometime before December 23rd, 1964? Is that correct?

"A. That's right.

* * * * * *

"Q. Do you recall any specific discussions regarding Exhibit No. 14?

"A. No."

Whether Mrs. Jennings ever saw any other figures is, of course, a factual question, and the answer is not included in the court's findings. After making a careful examination of all the testimony, we find no evidence that Mrs. Jennings ever actually saw the correct figures. We hold that all the elements necessary to fraud are present in this case.

In regard to Lee's second contention, it is undisputed that Mosier was representing both Lee and Jennings in this transaction. In Miller v. Wood, 188 Cal.App.2d 711, 10 Cal.Rptr. 770 (1961), the court was faced with the situation where a real estate agent acting for both parties in a transaction made false representations to one of the parties. Holding that such a dual agency did not protect one party from rescission of the contract by the other party, the court stated:

> "We have concluded that Beck was also the agent of Woods, and 'generally, the fact that a broker or agent in a real estate transaction is the agent for both parties is no defense to an action by one of the parties to hold the other party responsible for misrepresentations with regard to such other party's property made to him by the broker or agent' * * *. This is the rule in this State." 10 Cal.Rptr. at 772.

Our Court of Appeals has adopted this rule in Miller v. Boeger, 1 Ariz.App. 554, 405 P.2d 573 (1965), and we believe it is a sound one.

Plaintiff contends that the court erred in refusing to enter judgment against Mosier for damages which the plaintiff sustained due to his misrepresentations. She urges that a party who is fraudulently induced to enter a contract may maintain an action for rescission and damages within the same complaint. Mrs. Jennings' position is contradicted by our holding in Mahurin v. Schmeck, 95 Ariz. 333, 390 P.2d 576 (1964). A party who has been defrauded is put to an election of remedies, i. e. he may either rescind the contract or affirm the contract and sue for damages, but he cannot do both. By bringing an action to rescind the trade agreement, plaintiff has made her election. Any rights she may have in this matter must rise or fall with the theory of rescission.

However, defendants would have us deny Mrs. Jennings recovery of her land under a rescission theory for two reasons: (1) She did not make a proper tender back to Lee of the restaurant and other minor items received in the trade agreement, an absolute prerequisite of rescission; and (2) She allowed the mortgagee to foreclose on the restaurant, thus making it impossible to return Lee to the status quo ante, another prerequisite of rescission.

The general rule is that a party seeking to rescind a contract must restore or offer to restore to the other party that which he has received under the contract. Mahurin, supra; Modoc Mineral & Oil Co. v. Cal-Vada Drilling & Exploration Co., 236 Cal.App.2d 868, 46 Cal.Rptr. 508 (1965). Adverting to this general rule, Lee contends that such a restoration or offer to restore cannot be made at the time the suit is filed, i. e., the tender must precede the institution of the action. The majority rule in this country is otherwise. 12 C.J.S. Cancellation of Instruments § 44, 1963. In Barke v. Grand Mobile Homes Sales, Inc., 6 Mich.App. 386, 149 N.W.2d 236 (1967), the Court held that it was not necessary that the offer to restore precede the suit:

> "* * * 'It is said that plaintiff neither restored nor offered to restore to defendant the property received before seeking rescission. Neither was necessary. A bill in equity praying rescission proceeds on the theory that there has

been no rescission, not on the theory that rescission has already been accomplished.'

* * * * * *

It is not a condition precedent in this type of case, where rescission is sought by a complaint, equitable in nature." 149 N.W.2d at 238, 239.

See also Lowman v. Lowman, 105 Ind.App. 102, 12 N.E.2d 961 (1938) and First Nat. Bank of St. Paul v. Blocker, 150 Minn. 337, 185 N.W. 292 (1921). Therefore, we hold that Mrs. Jennings' statement in the complaint that she stood ready to return the property she had received constituted a proper tender.

Lee bases his second objection to Mrs. Jennings' attempt to rescind on the general rule that restoration of the parties to their status quo prior to the contract is a prerequisite to rescission. This rule is well-established in Arizona. Morgan v. Bruce, 76 Ariz. 121, 259 P.2d 558 (1953); Fish v. Valley Nat. Bank of Phoenix, 64 Ariz. 164, 167 P.2d 107 (1946). However, some courts have often refused to give it strict application where to do so would lead to inequitable results. In Delta Investing Corporation v. Moore, 6 Cir., 366 F.2d 516 (1966), the court was confronted with the situation where a leasehold interest which plaintiff had obtained from defendant had been cancelled after the defrauded plaintiff had informed defendant he would make no more rental payments. Although the plaintiff could not return the consideration and restore defendant to the status quo, the court, nevertheless, allowed plaintiff to rescind the contract. Quoting from Rhoads v. Leonard (D.C.W.D.Okl.), 113 F.Supp. 411 (1953), the Court stated:

"* * * 'Obviously, in the instant case, a return of the consideration by the plaintiff is impossible. The mortgagees have foreclosed their mortgages on the equipment in question. However, the Court believes the facts in the case at bar justify an application of an exception to the general rule of law regarding rescissions.

"The plaintiff acted as promptly as the case would permit upon discovering the extent of the defendant's misrepresentations and made every effort to make her position clear to the defendant and to enable the defendant to act swiftly and avoid loss.

* * * * * *

"Patently, rescission appears harsh in the case at bar inasmuch as the defendant cannot possibly be returned to the position occupied by him prior to the agreement in question. Although the Court frowns upon a situation where the rescission of a contract leaves one party * * * in a position of great loss, such a disposition is proper under the presented facts. Certainly, the plaintiff should not suffer for a loss brought on directly by the defendant's fraudulent misrepresentations and actions.'" 366 F.2d at 520, 521.

In our case Mrs. Jennings bent over backward to protect Lee's interest in the restaurant. After filing suit on February 4, 1965, she continued to operate the cafe for a week so that Lee could step back into a going business. When it became apparent that her demand for rescission had fallen on deaf ears, she closed the restaurant and took steps to preserve the property by winterizing the premises. In light of Mrs. Jennings' attempts to unwind the transaction and place all parties back in their prior positions with the least amount of disruption, Lee will not be heard to complain that the restaurant was not restored to him. Lee was aware of plaintiff's desire to rescind the transaction and knew full well what would happen if the mortgage payments were not made. The defrauded plaintiff will not lose her right to rescind when the defendant is directly responsible for plaintiff's inability to return the subject matter of the rescinded contract. Delta Investing Corp., supra; Harvey v. Thomas, 150 Okl. 106, 300 P. 772 (1931).

In light of the foregoing we hold that the lower court erred in refusing to

rescind the contract and return the Phoenix property to Mrs. Jennings. However, such a decree of rescission would not make Mrs. Jennings whole for several reasons. First, as part of this transaction defendant Lee encumbered her property with a first mortgage of $85,000.00 (to Gibralter Savings & Loan Association) and a second mortgage of $35,000.00 (to Jack Kelman). Second, Mrs. Jennings has paid or is obligated to pay a commission of $11,000.00 to defendant Mosier in connection with the trade. Therefore, in order to do complete justice in this equitable action to rescind the contract we hold that Mrs. Jennings must be allowed to recover from those who have defrauded her such sums as are necessary to restore her to her position prior to entering into this agreement.

Her recovery of this money is not inconsistent with the rule that a party may not rescind and recover damages in the same suit. That rule is designed to prevent a defrauded party from both repudiating the contract and then suing on it to gain the benefit of the bargain. There is ample authority that a defrauded party may not only receive back the consideration he gave, but also may recover any sums that are necessary to restore him to his position prior to the making of the contract. Kent Homes, Inc. v. Frankel, D.C.Mun.App., 128 A.2d 444 (1957); Hammac v. Skinner, 265 Ala. 9, 89 So.2d 70 (1956); Sidney Stevens Implement Co. v. Hintze, 92 Utah 264, 67 P.2d 632, 111 A.L.R. 331 (1937); Frickenschmidt v. Garner, 174 Okl. 559, 51 P.2d 537 (1935).

The final question then is which defendants should be liable for the amounts to be recovered by Mrs. Jennings. Although Mrs. Jennings argues long and vehemently that Kelman and Elliott Holding Company engineered the whole transaction with Lee acting as their agent, we do not find sufficient evidence in the record that would support that contention. While Kelman may have actively participated in the transaction, there is nothing to connect him with the fraudulent operating statement, and his timely modification of the option agreement with Lee do not rise to the dignity of an agency relationship.

On the other hand, the liability of Lee and Mosier seems beyond question. Lee's purported signature is on the false income statement which was a material inducement to Mrs. Jennings to enter the transaction. Lee did not deny that it was his signature, although he said, when asked whether it was:

> "Q. BY MR. TENNEY: Is this your signature at the bottom of this page?
>
> "A. I don't know. Don't look like mine."

A casual comparison of this signature with others which are admittedly Lee's shows a marked similarity. Further, Lee is bound by the misrepresentations of Mosier, his agent, who presented this income statement to Mrs. Jennings.

Mosier's liability is based on the breach of his fiduciary relationship with Mrs. Jennings. His conduct in showing his client a false operating statement and failing to discuss with her the correct statement, which he admittedly had in his possession, constitutes the breach. A broker is under a duty to disclose to his client information which he possesses pertaining to the transaction in question. See Walston & Co. v. Miller, 100 Ariz. 48, 410 P.2d 658 (1966).

Judgment of the trial court is reversed. The case is remanded with directions to enter judgment for rescission of the trade agreement, and for further proceedings to determine what is necessary to restore plaintiff to her status before execution of the trade agreement, including any monetary recovery which may be necessary to make her whole, in accordance with the principles set forth in this opinion, and to enter judgment in accordance with such determination.

UDALL, C. J., and STRUCKMEYER, McFARLAND and HAYS, JJ., concur.