**Sylvia SILVERS et al.,**
**Plaintiffs,**

**v.**

**TTC INDUSTRIES, INC., et al.,**
**Defendants.**

**Civ. A. No. 2459.**

United States District Court,
E. D. Tennessee,
Northeastern Division.

Dec. 28, 1970.

John S. McLellan and D. Bruce Shine, Kingsport, Tenn., for plaintiffs.

Dick L. Johnson and James E. Brading, Johnson City, Tenn., and John A. Armstrong, Greeneville, Tenn., for defendants.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

This is a removed, diversity action for the rescission of an agreement for the interchange of stock in Armstrong Glass Company, Inc. (Armstrong) and the defendant TTC Industries, Inc. (TTC). 28 U.S.C. §§ 1441(a), 1332(a)(1), (c). The plaintiffs sought supplemental injunctive relief in aid of the Court's jurisrdiction, 28 U.S.C. § 1651, and a trial on the merits was advanced and consolidated with the hearing of the application for the injunction on December 14, 1970. Prior to the trial, the defendant Mr. Ami Wilson became ill; whereupon, the Court confined the trial and hearing in such defendant's enforced absence to the issue of whether the plaintiffs were induced fraudulently to enter into the aforementioned agreement. The defendants moved for entry of a verdict for them at the conclusion of the plaintiffs' evidence and offered no evidence.

The plaintiffs are five of the seven former shareholders of Armstrong. Phyllis Silvers, custodian respectively for Robert Henry Silvers and Jerry Ellen Silvers, owners in the aggregate of 110 of the 1,335 shares of Armstrong, has never been a party hereto. The second largest shareholder of Armstrong, Mr. Lawrence S. Rapport, with 450 shares, was originally made a party plaintiff herein but disclaimed any interest thereas, and as to him such claim was dismissed.

■ At the very threshold of this consideration is the question of whether former holders of only 58.05% of the shares of Armstrong may proceed in equity for a rescission of an agreement for the exchange of 100% of such shares, for shares of TTC. The applicable law on this question has been clear for more than a century, viz.: there are

" * * * three classes of parties to a bill in equity. They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest

in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.

"A bill to rescind a contract affords an example of this kind. For, if only a part of those interested in the contract are before the court, a decree of rescission must either destroy the rights of those who are absent, or leave the contract in full force as respects them; while it is set aside, and the contracting parties restored to their former condition as to others. We do not say that no case can arise in which this may be done; but it must be a case in which the rights of those before the court are completely separable from the rights of those absent, otherwise the latter are indispensible parties. * * * "

Shields, et al. v. Barrow (1855), 58 U.S. (17 How.) 130, 139, 15 L.Ed. 158, 160; see also Gauss v. Kirk (1952), 91 U.S. App.D.C. 80, 198 F.2d 83, 85, citing Landram v. Jordan, D.C.App. (1905), 25 App.D.C. 291, 300, affirmed (1906), 203 U.S. 56, 27 S.Ct. 17, 51 L.Ed. 88. " * * * It is settled that 'Rescission of a contract * * * as to some of the parties, but not as to others, is not generally permitted.' * * * '[T]here is a general rule that where rights sued upon arise from a contract all parties to it must be joined.' * * * " Ward v. Deavers (1953), 92 U.S.App.D.C. 167, 203 F.2d 72, 75[1], [4].

The plaintiff Mrs. Sylvia Silvers exchanged 600 shares of Armstrong stock for 88,191 shares of class A and 22,235 shares of common stock of TTC; the plaintiff Mr. Harold J. Steiss and the plaintiff Mr. Benjamin C. Wheeler, each, exchanged 10 shares of Armstrong stock for 1,336 shares of Class A and 447 shares of the common stock of TTC; the plaintiffs Solomon and Gloria Benaroch exchanged 100 shares of Armstrong stock for 13,362 shares of class A and 3,369 shares of the common stock of TTC; the plaintiff Ms. Marilyn Silvers exchanged 55 shares of Armstrong stock for 7,349 of class A and 1,853 shares of the common stock of TTC. Each of these plaintiffs seeks a rescission of the interchange agreement. However, Mr. Rapport exchanged 450 shares of Armstrong stock for 60,129 shares of class A and 15,160 shares of the common stock of TTC, and Ms. Phyllis Silvers, as such aforementioned custodian, exchanged 55 shares of Armstrong stock for 7,349 shares of class A and 1,853 shares of the common stock of TTC on behalf of the aforenamed beneficiaries.

■ It is obvious that a judgment of this Court must either destroy the rights of Mr. Rapport and the custodial rights of Ms. Phyllis Silvers under the said agreement, or leave it in full force as respects them. Should the agreement be rescinded as to the plaintiffs, they would be restored to their ownership of the Armstrong shares, while Mr. Rapport and Ms. Phyllis Silvers would continue to own the TTC shares. There appears to be no way to completely separate the rights of the plaintiffs from the rights of the absent parties to this agreement. Thus, Mr. Rapport and Ms. Phyllis Silvers are 'indispensable parties, and in their absence from this litigation, rescission of the agreement to which they are parties cannot be ordered.

■■ Although not possessing under such circumstances jurisdiction to rescind the agreement herein, since the plaintiffs contend that the entire transaction between them and the defendants was fraudulent, the Court will consider whether relief other than rescission should be granted. Rule 54(c), Federal Rules of Civil Procedure; Wade v. Deavers, *supra*, 203 F.2d at 75[7]. There is nothing inconsistent between a claim by the plaintiffs for a rescission of the agreement and their claim for damages for fraud in the defendants' procurement of the contract. Simmons v. Evans (1947), 185 Tenn. 282, 206 S.W.2d 295, 298[8].

The progenitor of Armstrong was Mr. Charles Silvers, the husband of the plaintiff Mrs. Sylvia Silvers. He sought a location for a plant for the production of rough-rolled flat glass throughout Tennessee and chose Erwin as its site. In midyear 1965 he organized a group to build the plant there. Those who purchased stock in the new enterprise subscribed also to purchase $200 in debentures of the corporation for each share of common stock purchased.

The plant was completed, and production was commenced with about 85 employees in December, 1967. The products were sold in Chicago, Illinois, New York, New York, Miami, Florida and in Tennessee. Mr. Silvers claims to have instituted a novel process in the Erwin plant, which enabled Armstrong to produce rough-rolled flat glass at less cost than glass was being produced at that time. The operation returned a profit in the year 1968. However, the market for glass from the Erwin plant was depressed in that year by the importation of similar glass from Poland, Hungary and Yugoslavia and its sale in the United States by the defendant Mr. Ami Wilson.

In about July, 1968, Mr. Wilson communicated by telephone with Mr. Silvers, urging him to raise the price of glass produced at the Erwin plant. These conversations were continued for the remainder of the year 1968, leading eventually to discussions concerning the merger of Armstrong with TTC. This was attractive to Mr. Silvers, not only from the standpoint of eliminating the problem of the damage he considered the importation of foreign glass was having on the market for glass produced at Erwin, but also because Armstrong needed new equipment with which to temper the glass it produced, as then required by several governmental units. It was his thought that Armstrong, through the proposed merger, could obtain the needed financing for this additional facility. The unit desired was estimated to cost $100,000, while a smaller unit was available for $40,000. Mr. Silvers had also come to believe that TTC had a good sales force. It may be inferred reasonably that Mr. Wilson was attracted by Armstrong's production facilities, the potential of better prices for the sales of glass, and the brief success of Armstrong's operations in the field.

The merger negotiations continued. At one meeting in Miami, Florida, Mr. Silvers was advised that TTC was in the process of offering its stock for public sale. An arrangement was evolved, whereby TTC's personnel could become familiar with Armstrong's customers while this process was being consummated. Armstrong agreed on October 28, 1968 in TTC's offices in New York City to sell the entire output of Armstrong from its Erwin plant to TTC. At this same meeting the details of the merger were discussed in depth, and the parties signed a letter of intent to merge.

Simultaneously, Mr. Silvers was advised that TTC had discovered a novel spot-remover product for sale which had a vast sales potential. He was shown orders by Sears for thousands of dozens of this product, and visions emerged of millions of sales of this item by Sears. He was also told of orders from Sears, Montgomery Ward and Goldblatt's for another item, a psychodelic box called a psyche-i-delite. Mr. Wilson advised Mr. Silvers that the cost of producing the spot-remover would be only about 30% of the sales price, while the cost of production of the box would amount to about 35% of the sales price.

The plaintiffs were represented in these negotiations by their attorney, Truman Gibson, Esq., and their certified public accountant, Mr. Miles Seigel. The negotiators exchanged financial data, including balance sheets and copies of income tax returns. Top Trading Corp. and Ellsworth Goldstein, Inc. are both wholly-owned subsidiaries (as now is Armstrong) of TTC. The former reflected taxable income in 1966 of $57,159.55 and of $33,738.73 in 1967, while the intermediately named corporation reflected taxable income in those respective years of $32,665.47 and $52,972.21.

On November 5, 1968 (general election day) the defendant Mr. Ellsworth Goldstein advised Mr. Silvers in a further meeting in New York City that the orders he had been shown from Sears, Montgomery Ward and Goldblatt's were nonexistent. Mr. Silvers was disturbed that TTC's personnel had been "taken-in" by this hoax, and the negotiators discussed in detail the effect of the hoax on the financial position of TTC. Mr. Wilson reassured Mr. Silvers that the ordered inventories of removers and boxes remained saleable, predicted that TTC would even then earn a small profit from their sales, and that, in any event, there would be no resultant loss greater than $20,000 " * * * which would not be meaningful."

Despite the hoax practiced upon TTC, two full months afterward, the proposed merger was effectuated on January 14, 1969. By October 29, 1969, when this action was commenced in the Chancery Court of Unicoi County, Tennessee, Mr. Silvers had become convinced that the losses of TTC since the merger were more approximately $200,000 than $20,-000, and that TTC was in the throes of insolvency, due to the fraudulent misrepresentations of Mr. Wilson and the defendants' claimed fraud *sub silento* regarding matters of expense to which TTC was already committed, or as to which it was already obligated, at the time of the merger.

■ This consideration is begun with a presumption. " ' * * * [E]xcept those involving transactions between persons occupying fiduciary or confidential relations with each other where the right to relief is based upon the alleged commission of the fraud, the presumption is in favor of the fairness of the transaction and the innocence of the person accused * * *.' " Russell v. Zanone, C.A.Tenn. (1966), 55 Tenn.App. 690, 705, 404 S.W.2d 539, 545, certiorari denied (1966). " ' * * * The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reason-abl[y] reconcilable with fair dealing and honesty of purpose, which would lead a reasonable man to the conclusion that fraud in fact existed. * * * ' " *Idem.* " * * * [I]n a case where both parties have equal knowledge of matters misrepresented, equity is not inclined to relieve against false representation. * * * " Delta Investing Corporation v. Moore, C.A.6th (1966), 366 F.2d 516, 520.

" * * * It is well settled that in order to constitute fraud * * *, there must not only be a representation as to an existing fact but that such representation must have been false, must have been relied on, and must have been so material that it determined the conduct of the party seeking relief. * * " Dozier v. Hawthorne Development Co., C.A.Tenn. (1953), 37 Tenn.App. 279, 262 S.W.2d 705, 709[2], certiorari denied (1953). " * * * 'Ordinarily, representations, statements, or promises concerning future events are not actionable even though they be false.' * * * " *Ibid.*, 262 S.W.2d at 710. " * * * Representations by one of the parties to a contract cannot be relied on by the other party to avoid the contract unless such representations afforded a material inducement to the formation of such contract. * * * " Cooley v. East & West Ins. Co. (1933), 166 Tenn. 405, 412(7), 61 S.W.2d 656, 659. " * * * '[O]ne may be guilty of fraud by his silence, as where it is expressly incumbent upon him to speak concerning material matters that are entirely within his own knowledge.' * * * " Simmons v. Evans, *supra*, 206 S.W.2d at 296 [1]. " * * * This Court held as early as 1813 'it to be a sound principle of equity that each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it, unless common observation would have furnished the information.' * * * We construe the expression 'common observation' as used in the above quotation, to include the exercise of ordinary diligence. * * * " *Ibid.*, 206 S.W.2d at 296[2].

The crux of this determination is whether Mr. Silvers, acting for the plaintiffs, exercised ordinary diligence to discover the information about which there is now such great complaint. Mr. Wilson had advanced personally $2,500 to a persuasive salesman named Harvey Gershien to pay travel expenses, to be reimbursed out of a drawing account of $1,000 per week against agreed commissions, and had arranged for the manufacture of the added items, as well as containers, supplies and other items designed to reap the portending harvest. On November 18, 1969, Mr. Wilson had committed TTC to a $43,000 contract to produce television advertisements of these products. According to an affidavit of Mr. Wilson, the total commitment of TTC to this project was " * * a sum in excess of $200,000.00. This fiendish blow to the defendants herein [Top Trading Corp. and Global Adhesives Corp. (another wholly-owned subsidiary of TTC)] almost wrecked them financially. * * * "

Even after being put squarely on notice that TTC did not have the exciting orders for its new products, Mr. Silvers, for reasons best known to himself, did not exercise ordinary diligence to obtain the information which, it must be assumed, was reflected in the books and records of TTC. Despite the fact that his personally-selected certified public accountant was present with him in the post-fraud investigations, no investigation was made of TTC's records. Mr. Seigel undertakes to explain this lack of diligence with the assertion that he was advised that an audit of TTC's books was in progress at that time. Although Mr. Seigel claims that either Mr. Wilson or Mr. Ellsworth Goldstein assured him that no commitents had been made " * * * except in the range of three to four thousand dollars * * * ", this is patently incongruous with the information that TTC had been contemplating, before their fraudulent character was discovered, orders for some $300,000 worth of these new products. The only conclusion the Court can infer from all the circumstances is that Mr. Silvers was willing to accept Mr. Wilson's prediction of future events, in order to get Armstrong in a better competitive position and to obtain funds with which to add the needed tempering facilities in its Erwin plant.

" * * * [B]y ordinary diligence is meant, that degree of care demanded by the circumstances. * * * " Atherton v. Anderson, C.C.A.6th (1938), 99 F.2d 883, 888[9]. The circumstances confronting Mr. Silvers demanded that he proceed with the utmost caution. He had already become disenchanted that the personnel of TTC had been "taken-in" by a sharp salesman. It seems to the Court that, before making the business judgment to advise the committal of the stock of the plaintiffs for the stock of TTC, the circumstances demanded that his accountant peruse the books and records of such an organization with the proverbial "fine-tooth comb", and that his attorney obtain more than predictions of future events from Mr. Wilson regarding the impact of the fraud on the financial position of TTC. It is axiomatic that, as the danger that should reasonably be apprehended increases, so does the amount of care required by the law to be exercised also increase. Leach v. St. Louis-San Francisco Ry. Co., C.C. A.6th (1931), 48 F.2d 722, 724[4]; Shuler v. Clabough, C.A.Tenn. (1954), 38 Tenn.App. 333, 274 S.W.2d 17, 20[5], certiorari denied (1954).

From all this the Court finds and concludes that the plaintiffs are not entitled to damages for fraud in the defendants' procurement of the agreement, which is the subject matter of this litigation. Finding the plaintiffs have not stated a claim on which relief can be granted against the defendants herein, Rule 12(b)(6), Federal Rules of Civil Procedure, the motion of the defendants for entry of a judgment that the plaintiffs take nothing from the defendants hereby is GRANTED, and an interlocutory judgment to that effect will enter.

■ There being collateral and subsidiary matters remaining for decision herein, the complaint will not be dismissed at this time. It being the opinion of this Court that this instant order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal herefrom may materially advance the ultimate termination of this litigation, the plaintiffs may apply to the United States Court of Appeals for the Sixth Circuit within ten days herefrom for permission to appeal from this order, such an order not staying proceedings in this Court, unless it is so ordered. 28 U.S.C. § 1292(b).