(text box: 1)(text box: 2) IN THE COURT OF APPEALS

 STATE OF ARIZONA

 DIVISION TWO

RICHARD GRAND and MARCIA GRAND, co-trustees of the

R.M. Grand Revocable Living Trust,

dated January 25, 1991,

Plaintiffs/Appellants,

               v.                             

JOSEPH P. NACCHIO, a New Jersey resident; JOHN A. McMASTER,

a New Jersey resident; QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation,

Defendants/Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

2 CA-CV 2006-0033

DEPARTMENT B

O P I N I O N

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C-20025348

Honorable Carmine Cornelio, Judge

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

Meyer Hendricks, PLLC

  By Tom Galbraith

and

Munger Chadwick

  By Michael J. Meehan

Fennemore Craig, P.C.

  By A. Bates Butler III and James D. Burgess

and

Boies, Schiller & Flexner LLP

  By James P. Denvir and Jonathan Sherman

Lewis and Roca LLP

  By John N. Iurino 

Perkins Coie Brown & Bain P.A. 

  By Joseph E. Mais and Brian C. Lake

Phoenix

Tucson

Attorneys for Plaintiffs/Appellants

Tucson

Washington

Attorneys for Defendant/Appellee Qwest International, Inc.

Tucson

Attorneys for Defendant/Appellee John A. McMaster

Phoenix

Attorneys for Defendant/Appellee Joseph P. Nacchio

B R A M M E R, Judge.

Appellants Richard and Marcia Grand, trustees of the R.M. Grand Revocable Living Trust (collectively, the Trust), appeal from the trial court’s grant of summary judgment in favor of appellees Joseph Nacchio, John McMaster, and Qwest Communications International, Inc.  The Trust filed a securities fraud action against Qwest concerning the Trust’s purchase of shares in KPNQwest, an affiliate of Qwest Communications.  

The Trust contends on appeal that the trial court erred by finding it was not entitled to rescind the purchase on the grounds it could not tender the purchased shares and was not permitted to tender substitute shares.  The Trust also contends that its Arizona statutory claims do not require it to show a causal connection between the alleged misrepresentations and its loss and that summary judgment on its common law fraud and consumer fraud claims was premature.  We affirm the trial court’s grant of Qwest’s partial summary judgment motion on the Trust’s claims for damages, but reverse the summary judgment entered against the Trust on its claims for rescission.

Factual and Procedural Background

On review of a summary judgment, we “view the evidence in the light most favorable to the party opposing the motion for summary judgment and draw all inferences fairly arising from the evidence in that party’s favor.”
  Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken
, 179 Ariz. 289, 293, 877 P.2d 1345, 1349 (App. 1994).  The salient facts appear to be uncontested and are as follows:

In 1999, Dutch telecommunications company KPNQwest sold shares of its stock through an initial public offering, and the stock began trading on the NASDAQ stock exchange.  Qwest International, through its subsidiary Qwest B.V., was a controlling shareholder in KPNQwest.  At that time, Joseph Nacchio was chairman and chief executive officer (CEO) of Qwest International and chairman of KPNQwest’s supervisory board.  John McMaster was CEO and president of KPNQwest.  Over a few-month period, the Trust purchased 285,000 shares of KPNQwest stock.  By the end of 2000, the NASDAQ Telecom Index had dropped more than sixty percent, and the Trust had sold 255,000 of its shares.

Following those sales, a series of news articles and public disclosures by KPNQwest suggested it had engaged in questionable accounting practices that had inflated its revenue.  After these disclosures, KPNQwest’s stock further and rapidly depreciated, and in May 2002, KPNQwest filed for bankruptcy in the Netherlands.  The Trust sold its remaining KPNQwest shares after the disclosures but before the bankruptcy filing. 

The Trust filed an action against Qwest in October 2002 alleging several federal and Arizona statutory securities violations.  The Trust later amended its complaint to include common law fraud and breach of duty claims.  The trial court dismissed the majority of the claims, and the Trust filed a second amended complaint.  That complaint alleged violations of Arizona securities laws under A.R.S. §§ 44-1997, 44-1998, and 44-1991 and of federal securities laws under 15 U.S.C. §§ 77k and 77
l
(a)(2).  The complaint also included a claim for violations of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 through 44-1534, and common law claims for breach of fiduciary duty and fraudulent concealment.  The complaint sought rescission of the Trust’s purchases of the KPNQwest stock, compensatory and punitive damages, and costs.  

In April 2005, the United States Supreme Court decided 
Dura Pharmaceuticals, Inc. v. Broudo
, 544 U.S. 336, 125 S. Ct. 1627 (2005).  Qwest then moved for partial summary judgment, arguing 
Dura
 had held that a “plaintiff[] cannot recover damages for alleged securities fraud if . . . [it] sold [its] stock prior to the time that ‘the relevant truth’ regarding that alleged fraud began to leak out.”  Qwest reasoned that, because the Trust admitted it had sold 255,000 shares of KPNQwest stock before public disclosure of potential wrongdoing by Qwest, the Trust could not show causation and its claims for damages relating to those shares must be dismissed.  The motion also claimed the Trust could not rescind the transaction because it had sold the shares and could not tender them to Qwest as required by law.  

Following oral argument, the trial court determined the Trust could not maintain its statutory or common law claims for damages “without any evidence that the decline in the securities price was causally related to the alleged misrepresentations.”  The court ruled the Trust had failed to produce sufficient evidence that “the decline in KPNQwest share price (during [the Trust’s] holding period) was caused by [Qwest’s] allegedly fraudulent actions or misrepresentations.”  The court also decided that, although the Trust “did not tender, cannot now, and should not be allowed ‘substitute tender’” of the securities, it could seek rescissory damages on its Arizona statutory claims without showing a causal link between the decline in the stock’s value and Qwest’s alleged misrepresentations.
(footnote: 1)  

After Qwest moved for reconsideration of that decision, the trial court reversed itself and determined the Trust did have to show causation to obtain rescissory damages.  Thus, the trial court granted Qwest’s motion for summary judgment on all the Trust’s claims involving the 255,000 shares of stock it had sold before the public disclosures by KPNQwest.  The trial court then granted the Trust’s motion to dismiss, without prejudice, its remaining claims involving the other 30,000 shares so the Trust could file this appeal.
(footnote: 2)
Jurisdiction

After oral argument, we requested supplemental briefing by the parties on the question of whether the Trust’s voluntary dismissal without prejudice, rather than with prejudice, of “[a]ll of the claims pled in the Second Amended Complaint concerning shares of KPNQwest stock sold by plaintiffs during 2002” rendered unappealable the trial court’s grant of Qwest’s motion for partial summary judgment on claims concerning those shares the Trust sold in 2000.

The trial court’s grant of partial summary judgment addressed only
 the Trust’s claims for stock it sold in 2000 and not the claims for stock it sold in 2002.  The parties, at the suggestion of the trial court, stipulated to dismissal without prejudice of the claims arising from the shares sold in 2002 
and apparently entered into an agreement tolling the statute of limitations as to those claims.

We are obligated to examine our jurisdiction over an appeal; “the right to appeal exists only by force of statute.”  
Cordova v. City of Tucson
, 15 Ariz. App. 469, 470, 489 P.2d 727, 728 (1971)
.  Section 12-2101, A.R.S., governs our appellate jurisdiction.  Relevant to this case, subsection (B) of § 12-2101 permits an appeal only from a “final judgment.”  Generally, an order granting a voluntary dismissal of an action without prejudice to its being refiled is not an appealable, final judgment.  
R.L. Harris & Co. v. Houck
, 22 Ariz. 340, 341, 197 P. 575, 575 (1921) (voluntary dismissal without prejudice not appealable).

We are aware of no Arizona case that squarely addresses the question before us:  whether § 12-2101 permits a party to obtain appellate review of an adverse partial summary judgment by dismissing the remaining claims without prejudice.  
But cf. Tucson Estates Residents Ass’n v. Mobilife Corp.
, 26 Ariz. App. 83, 84, 546 P.2d 352, 353 (1976) (accepting appeal of summary judgment on one count after appellants had voluntarily dismissed second count without prejudice, without discussing jurisdictional issue).
  Thus, because federal law similarly restricts appellate jurisdiction to “final decisions,”  28 U.S.C. § 1291, we turn to federal precedent for guidance.  
See Reader v. Magma-Superior Copper Co.
, 108 Ariz. 186, 187, 494 P.2d 708, 709 (1972) (language of 28 U.S.C. § 1291 similar to A.R.S. § 12-2101).

The federal circuits are split, however, on how to resolve this question.  Several circuits have concluded they lack jurisdiction of appeals in these situations.  
See
 
State Treasurer of Mich. v. Barry
, 168 F.3d 8, 13 (11th Cir. 1999) (“[V]oluntary dismissals, granted without prejudice, are not final decisions themselves and also do not transform an earlier partial dismissal or partial summary judgment order into a final decision.”); 
Chappelle v. Beacon Commc’ns Corp.
, 84 F.3d 652, 654 (2d Cir. 1996)
 (“We agree with those courts that have precluded an appeal from a dismissal of some of a plaintiff’s claims when the balance of his claims have been dismissed without prejudice.
”); 
Cook v. Rocky Mountain Bank Note Co.
, 974 F.2d 147, 148 (10th Cir. 1992)
 (“[W]hen a plaintiff voluntarily requests dismissal of her remaining claims without prejudice in order to appeal from an order that dismisses another claim with prejudice, we conclude that the order is not ‘final’ for purposes of [28 U.S.C.] § 1291.
”).  
Other circuits have concluded the opposite.  
See Chrysler Motors Corp. v. Thomas Auto Co.
, 939 F.2d 538, 540 (8th Cir. 1991)
 (“The effect of [dismissal of claims without prejudice] was to make the judgment granting partial summary judgment a final judgment for purposes of appeal, even though the district court had not so certified under Fed. R. Civ. P. 54(b).
”)
;
 Hicks v. NLO, Inc.
, 825 F.2d 118, 120 (6th Cir. 1987)
 
(“[W]e hold that plaintiff’s [voluntary] dismissal with the concurrence of the court of the only count of her complaint which remained unadjudicated imparted finalty to the District Court’s earlier order granting summary judgment. Hence, plaintiff’s appeal is properly before this Court.
”)
.
 
 

The Ninth Circuit has adopted a hybrid rule and will exercise jurisdiction where there is no evidence the parties “attempted to manipulate [its] appellate jurisdiction,” for example, by stipulating that a party could reinstate the dismissed claim should the appellate court reverse the trial court’s ruling, regardless of the application of the statute of limitations or laches.  
James v. Price Stern Sloan, Inc.
, 283 F.3d 1064, 1066 (9th Cir. 2002); 
see Dannenberg v. Software Toolworks, Inc.
, 16 F.3d 1073, 1077 (9th Cir. 1994) (no appellate jurisdiction because “the parties stipulated to revive the dismissed claims in the event of reversal on appeal”
); 
Cheng v. Comm’r
, 878 F.2d 306, 310-11 (9th Cir. 1989) (same).

Section 12-2101 and its federal counterpart protect the public policy “against deciding cases piecemeal.”  
Musa v. Adrian
, 130 Ariz. 311, 312, 636 P.2d 89, 90 (1981);
 see Barry
, 168 F.3d at 13 (“[E]xercising jurisdiction here ‘would undermine the policies of judicial efficiency, avoiding piecemeal litigation, and district court independence that are the basis of the final judgment rule.’”
), 
quoting Constr. Aggregates, Ltd. v. Forest Commodities Corp.
, 147 F.3d 1334, 1336 (11th Cir. 1998).  Permitting a party to pursue an interlocutory appeal by dismissing its remaining claims without prejudice would contravene that policy.  And we agree with the Eleventh Circuit that finding jurisdiction exists in these situations would “significantly erode[]” Rule 54(b), Ariz. R. Civ. P., 16 A.R.S., Pt. 2
.;  
Barry
, 168 F.3d at 14;
 see S. Cal. Edison Co. v. Peabody W. Coal Co.
, 194 Ariz. 47, ¶ 19, 977 P.2d 769, 775 (1999)
 
(“[Rule 54(b)] is designed as a compromise between the policy against interlocutory appeals and the desirability, in a few cases, of an immediate appeal to prevent an injustice.”);
 
see also Hill v. City of Phoenix
, 193 Ariz. 570, ¶ 16, 975 P.2d 700, 703 (1999) (“The application of federal Rule 54(b) is helpful in our interpretation of the Arizona rule.
”).  Moreover, even if we were to adopt a hybrid rule as the Ninth Circuit has, jurisdiction would not vest here because the parties have agreed to toll the statute of limitations on the 2002 stock sale claims.  
See James
, 283 F.3d at 1066.  Thus, we conclude the parties’ dismissal of claims not yet adjudicated with the intent to refile the claims later does not constitute a final order appealable under § 12-2101.

The trial court’s judgment, however, stated, “[t]here is no just reason for delay,” and directed the entry of judgment.  Although the trial court did not mention Rule 54(b), the court’s language was clearly meant to certify the judgment for appeal pursuant to that rule.
(footnote: 3)  Certification under Rule 54(b), however, “does not give this court jurisdiction to decide an appeal if the judgment in fact is not final, i.e., did not dispose of at least one separate claim of a multi-claim action.”  
Davis v. Cessna Aircraft Corp.
, 168 Ariz. 301, 304, 812 P.2d 1119, 1122 (App. 1991).  “[A] claim is separable from others remaining to be adjudicated when the nature of the claim already determined is ‘such that no appellate court would have to decide the same issues more than once even if there are subsequent appeals.’”
  Cont’l Cas. v. Superior Court
, 130 Ariz. 189, 191, 635 P.2d 174, 176 (1981), 
quoting Curtiss-Wright Corp. v. Gen. Elec. Co.
, 446 U.S. 1, 8, 100 S. Ct. 1460, 1465 (1980).  We review a trial court’s determination that multiple claims exist for an abuse of discretion.  
Id.

Qwest admits the loss causation question it raised in its summary judgment motion “does not apply to the claims based on the stock that [the Trust] sold in 2002.”  Thus, the trial court’s grant of that motion essentially bifurcated the Trust’s claim, requiring different proof of proximate cause and having different “‘factual bas[e]s for recovery.’” 
  Cont’l Cas.
, 130 Ariz. at 191, 635 P.2d at 176, 
quoting Title Ins. Co. of Minn. vs. Acumen Trading Co.
, 121 Ariz. 525, 526, 591 P.2d 1302, 1303 (1979).  For this reason, Qwest argues the claims based on the 2002 sales are separately enforceable because “no appellate court would have to decide the loss causation issue more than once.”  The trial court’s ruling and the Trust’s appeal, however, address several issues applicable to both the 2000 sales and the 2002 sales:  whether selling the shares on the open market is adequate tender; if substitute tender for the purpose of rescinding the stock sales is permitted; whether a plaintiff pursuing claims brought under A.R.S. § 44-1991(A)(1) and (3) must show loss causation; and whether a rescissory damages claim requires proof of loss causation.  Other than on the issue of loss causation and the trial court’s ruling about the applicability of 
Dura
, there is no relevant factual difference between the claims based on the stock sold in 2000 and those based on the stock sold in 2002.  Consequently, if we accept the trial court’s Rule 54(b) certification, subsequent litigation on the 2002 stock sale claims could raise issues that are, for all practical purposes, identical to the issues raised, and that we must decide, in this appeal.  At first blush, therefore, 
Continental Casualty
’s test
 is not met.

Continental Casualty
, however, did not address how the doctrines of issue preclusion or law of the case affect Rule 54(b) certification.  If we decide the issues presented in this appeal and remand the case, the law of the case doctrine would likely prevent further review of any issues we address.  
See Powell-Cerkoney v. TCR-Montana Ranch Joint Venture, II
, 176 Ariz. 275, 278, 860 P.2d 1328, 1331 (App. 1993) (law of the case doctrine permits trial court to “refus[e] to reopen questions previously decided in the same case by the same court or a higher appellate court”); 
Ziegler v. Superior Court
, 134 Ariz. 390, 393, 656 P.2d 1251, 1254 (App. 1982) (“[T]he decision of an appellate court in a case is the law of that case . . . throughout all the subsequent proceedings in the case in both the trial and appellate courts, provided the facts and issues are substantially the same as those on which the first decision rested.
”).  And, if we affirm the trial court’s judgment
 in this appeal, issue preclusion could prevent relitigation or appeal of issues related to the claim for the stock sold in 2002.  
See Hullett v. Cousin
, 204 Ariz. 292, ¶ 27, 63 P.3d 1029, 1034-35 (2003)
 
(“[I]ssue preclusion . . . applies when an issue was actually litigated in a previous proceeding, there was a full and fair opportunity to litigate the issue, resolution of the issue was essential to the decision, a valid and final decision on the merits was entered, and there is common identity of parties.”).  If we apply these doctrines, accepting Rule 54(b) certification here would meet the 
Continental Casualty 
test.  Indeed, if issue preclusion and the law of the case doctrine apply to Rule 54(b) certification, it is difficult to envision a case that would not meet that test.  Thus, we decline to apply these doctrines because doing so may effectively nullify the test our supreme court adopted in 
Continental Casualty
. 
 See City of Phoenix v. Leroy’s Liquors, Inc.
, 177 Ariz. 375, 378, 868 P.2d 958, 961 (App. 1993) (“[W]e are bound by decisions of the Arizona Supreme Court and have no authority to overrule, modify, or disregard them.”).

The Trust requests, in the event we conclude we lack appellate jurisdiction, that we exercise our discretion and consider its appeal as a petition for special action.  
See Danielson v. Evans
, 201 Ariz. 401, ¶ 35, 36 P.3d 749, 759 (App. 2001)
 (after determining it lacked appellate jurisdiction, appeals court sua sponte accepted special action jurisdiction);
 
Lloyd v. State Farm Mut. Auto. Ins. Co.
, 189 Ariz. 369, 374-75, 943 P.2d 729, 734-35 (App. 1996)
 (same); 
see also 
A.R.S. § 12-120.21(A)(4) (court of appeals has “[j]urisdiction to hear and determine petitions for special actions brought pursuant to the rules of procedure for special actions, without regard to its appellate jurisdiction”).  

We may take special action jurisdiction when a trial court’s ruling constitutes “an abuse of discretion.”  
Ariz. R. P. Spec. Actions 3(c), 17B A.R.S.
   A trial court abuses its discretion if it “base[s] its ruling on an error of law.”  
Speer v. Donfeld
, 193 Ariz. 28, ¶ 9, 969 P.2d 193, 196 (App. 1998).  “The acceptance of special action jurisdiction is highly discretionary in this court” and “is not available where there is an equally plain, speedy, and adequate remedy by appeal.”  
Harris Trust Bank of Ariz. v. Superior Court
, 188 Ariz. 159, 162, 933 P.2d 1227, 1230 (App. 1996); 
see also 
Ariz. R. P. Spec. Actions 1(a), 17B A.R.S.

In its appeal, the Trust raises issues that are predominantly, although not exclusively, purely legal issues that are of first impression in Arizona.  
See Piner v. Superior Court
, 192 Ariz. 182, ¶ 10, 962 P.2d 909, 912 (1998) (accepting special action jurisdiction of issue of first impression); 
see also Orme Sch. v. Reeves
, 166 Ariz. 301, 303, 802 P.2d 1000, 1002 (1990) (special action jurisdiction proper when question presented “is a pure issue of law, requiring neither factual review nor interpretation”).  And the record before us is adequate for us to decide those legal questions.  
See Piner
, 192 Ariz. 182, ¶ 10, 962 P.2d at 912 (special action jurisdiction appropriate when “legal issue[s] can properly be decided on the present record”).  Moreover, any decision we made on appeal concerning issues that are not purely legal would affect only the claims about the stock the Trust sold in 2000.

Should we decline special action jurisdiction and dismiss the appeal, jurisdiction would be revested in the trial court.  
See Baumann v. Tuton
, 180 Ariz. 370, 372-73, 884 P.2d 256, 258-59 (App. 1994).  The Trust could then refile its claims related to the 2002 stock sales and the case would proceed.  When a final judgment is reached in the trial court, the Trust would assuredly file a virtually identical appeal, adding any new issues related solely to the 2002 stock sale claims.  In the alternative, the Trust could refile its 2002 stock sale claims, dismiss them with prejudice, and immediately file an appeal raising the same issues currently before us.

In any event, nothing that may occur in the trial court would likely alter the disposition of the issues raised in this appeal.  Moreover, the Trust would inevitably raise the same issues currently before us following final resolution of the 2002 stock sale claims.  Thus, the interests of judicial efficiency support our exercise of special action jurisdiction.  
See Moore v. Browning
, 203 Ariz. 102, ¶ 2, 50 P.3d 852, 854 (App. 2002) (accepting special action jurisdiction, in part, “[b]ecause [the issue raised on appeal] must inevitably be determined, it makes little sense for us to permit the trial to proceed knowing that it will not then be addressed”); 
Harris Trust Bank
, 188 Ariz. at 162, 933 P.2d at 1230 (judicial economy concerns are factor in accepting special action jurisdiction).  Additionally, the parties received a draft decision
(footnote: 4) before oral argument in this case that noted, and declined to address, several issues the Trust did not raise on appeal.  If we decline special action jurisdiction, the Trust could raise those issues in a subsequent appeal.

Declining special action jurisdiction would require the Trust to pursue further proceedings in the trial court while leaving the vast majority of its claims unresolved until a later appeal that would raise the same legal questions currently before us.
  Therefore, for the reasons stated above, we conclude the Trust lacks an “
equally plain, speedy, and adequate remedy by appeal” and accept special action jurisdiction.  
Harris Trust Bank
, 188 Ariz. at 162, 933 P.2d at 1230; 
see also 
Ariz. R. P. Spec. Actions 1(a).

Discussion

A trial court properly grants summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Ariz. R. Civ. P. 56(c), 16 A.R.S., Pt. 2; 
Orme Sch. v. Reeves
, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990).   “On appeal from a summary judgment, we must determine 
de novo
 whether there are any genuine issues of material fact and whether the trial court erred in applying the law.”  
Bothell v. Two Point Acres, Inc.
, 192 Ariz. 313, ¶ 8, 965 P.2d 47, 50 (App. 1998).
  A trial court should only grant a motion for summary judgment “if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.”  
Orme Sch.
, 166 Ariz. at 309, 802 P.2d at 1008.

Statutory Remedies for Securities Fraud

In an action for securities fraud under the Arizona statutes, a plaintiff may, upon tender of the securities purchased, “recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities.”  A.R.S. § 44-2001(A).  That portion of § 44-2001(A) is similar to the equitable remedy of rescission, which “is not a damage award at all.  Rather, it contemplates the ‘undoing of the transaction,’ whereby each party gives back to the other what it parted with in the original transaction.”  
Standard Chartered PLC v. Price Waterhouse
, 190 Ariz. 6, 34, 945 P.2d 317, 345 (App. 1996).
(footnote: 5)  Accordingly, “damage is not an element of securities fraud.”  
Aaron v. Fromkin
, 196 Ariz. 224, ¶ 20, 994 P.2d 1039, 1043 (App. 2000).  To effect rescission, a buyer typically must tender the purchased property to the seller. 
 See Jennings v. Lee
, 105 Ariz. 167, 171, 461 P.2d 161, 165 (1969) (“The general rule is that a party seeking to rescind a contract must restore or offer to restore to the other party that which he has received under the contract.”).

“[I]f the purchaser no longer owns the securities,” however, he or she may recover damages.  § 44-2001(A).  Although this statute does not specify the method for calculating these damages, federal securities fraud actions commonly permit two types of damage calculations:  rescissory damages and out-of-pocket damages.  
See Stone v. Kirk
, 8 F.3d 1079, 1092 (6th Cir. 1993).
 
 Rescissory damages may be used “when rescission, though appropriate, is impossible or infeasible (as when the buyer has sold the property to a third party).”  
Standard Chartered PLC
, 190 Ariz. at 34, 945 P.2d at 345.
  “‘Rescissory damages are a money award designed to be as nearly as possible the financial equivalent of rescission.’” 
 Id.,
 
quoting In re MAXXAM, Inc.
, 659 A.2d 760, 775 n.15 (Del. Ch. 1995)
.

Rescissory damages are the difference between the consideration paid by the buyer and the amount realized when the buyer sold the security, together with any income received from owning it.  
Id. 
at 35, 945 P.2d at 356.  Out-of-pocket damages are “‘the difference between the fair value of all that the [plaintiff] received and the fair value of what [the plaintiff] would have received had there been no fraudulent conduct.’”  
Stone
, 8 F.3d at 1092, 
quoting Randall v. Loftsgaarden
, 478 U.S. 647, 661-62, 106 S. Ct. 3143, 3152 (1986) (first alteration in 
Stone
).  Thus, out-of-pocket damages “accept the transaction as completed, whereas rescissory damages attempt to undo it.” 
 Standard Chartered PLC
, 190 Ariz. at 35, 945 P.2d at 356.  And, out-of-pocket damages “are measured by reference to the value of the property 
on the date of the transaction
.” 
 
Id.
  Conversely, “rescissory damages, in order to approximate the undoing of the transaction, take account of the value of the property, and any income produced by it, 
after the date of the transaction
.”  
Id.

The Loss Causation Requirement and 
Dura Pharmaceuticals, Inc.

Causation in securities fraud “has two elements:   transaction causation and loss causation.”  
AUSA Life Ins. Co. v. Ernst & Young
, 206 F.3d 202, 209 (2d Cir. 2000).  Loss causation is nothing more than proximate cause—“the allegedly unlawful conduct caused the economic harm.” 
 Id.
  Conversely, “[t]ransaction causation means that ‘the violations in question caused the appellant to engage in the transaction in question’” and “has been analogized to reliance.”  
Id.,
 
quoting Schlick v. Penn-Dixie Cement Corp.
, 507 F.2d 374, 380 (2d Cir. 1974). 

Much of the argument before us pivots on the parties’ interpretation of the Supreme Court’s decision in 
Dura Pharmaceuticals, Inc. v. Broudo
, 544 U.S. 336, 125 S. Ct. 1627 (2005), and how it relates to proximate cause in the securities fraud context.  In 
Dura
, the plaintiffs brought a securities fraud class action and, in alleging their economic losses, stated only that they had, “‘[i]n reliance on the integrity of the market, . . . paid artificially inflated prices for Dura securities.’” 
Id. 
at 340, 125 S. Ct. at 1630.  The Ninth Circuit determined the “plaintiffs need only ‘establish,’ i.e., prove, that ‘the price on the date of purchase was inflated because of the misrepresentation.’” 
Id. 
at 342, 125 S. Ct. at 1631, 
quoting Broudo v. Dura Pharmaceuticals, Inc.
, 339 F.3d 933, 938 (9th Cir. 2003).

The Supreme Court reversed the Ninth Circuit, ruling that “an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.”  
Id
.  The 
Dura
 Court stated the Ninth Circuit rule was “inconsistent with the law’s requirement that a plaintiff prove that the defendant’s misrepresentation (or other fraudulent conduct) proximately caused the plaintiff’s economic loss.”  
Id.
 at 346, 125 S. Ct. at 1633-34.  And, the Court said, it “need not, and d[id] not, consider other proximate cause or loss-related questions.”  
Id
.

In 
Dura
,  544 U.S. at 344, 125 S. Ct. at 1633, the Supreme Court referred to comment b to § 548A of the Restatement (Second) of Torts (1977), which addresses the “legal causation of pecuniary loss” and states, in part:

[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market.

Qwest relies on this reference to argue the holding in 
Dura
 means “a misrepresentation causes a loss only if that loss reflects a drop in the price of the securities that directly results from the revelation of the truth behind the misrepresentation.”  We disagree; 
Dura
 creates no such rule.  The Supreme Court referred to the Restatement to illustrate that the Ninth Circuit’s “‘inflated purchase price’ approach” was inconsistent with “the judicial consensus” on proximate cause, 
544 U.S.
 at 344, 125 S. Ct. at 1632-33, and to clarify that implied private actions for securities fraud resemble common law misrepresentation actions and thus require a showing of proximate cause, 
id.
 at 343, 125 S. Ct. at 1632.  The Court did not suggest it was describing the exclusive means by which a plaintiff can establish proximate cause. 

Moreover, an illustration for comment b of Restatement § 548A makes it clear that the section the Supreme Court quoted does not describe an exclusive method of proving causation.  That illustration states: 

A, seeking to buy bonds for investment, approaches B.  B offers A the bonds of X Oil Corporation, fraudulently misrepresenting its financial condition.  In reliance upon these statements, A buys the bonds.  After his purchase conditions in the oil industry become demoralized and as a result of financial losses the X Oil Corporation becomes insolvent.  Because of the insolvency A suffers a pecuniary loss greater than that which would have resulted from the deterioration of conditions in the industry alone.  It is found that if the financial condition of the Corporation had been as represented it would probably have weathered the storm and not become insolvent.  B is subject to liability to A for the additional pecuniary loss resulting from the insolvency.

Id
., illus. 2.  Thus, under the Restatement, if a plaintiff shows the misrepresentations affected the financial health of an entity and, consequently, the value of the plaintiff’s stock, the plaintiff has made a sufficient showing of proximate cause.

Although we are aware of only one appellate court that has interpreted 
Dura
 as Qwest does
, several federal courts have articulated Qwest’s view.  
See Glaser v. Enzo Biochem, Inc.
, 464 F.3d 474, 477 (4th Cir. 2006) (“[W]e agree with the district court that 
Dura
 requires plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed.”); 
In re Bradley Pharmaceuticals, Inc. Sec. Litig.
, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (suggesting plaintiff must show truth had become known before share price declined); 
Joffee v. Lehman Bros., Inc.
, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (“Plaintiffs have not alleged any disclosure of the alleged scheme of which they complain that caused the stock price to decline.”).  We conclude, however, that although demonstrating that the price of a security dropped following the disclosure of some misrepresentation is one method of proving loss causation, nothing in 
Dura
 makes it the exclusive method.  
See, e.g., In re The Warnaco Group, Inc. Sec. Litig. (II)
, 388 F. Supp. 2d 307, 317 (
S.D.N.Y. 2005) (plaintiff may meet loss causation requirement by showing “that the defendant ‘misstated or omitted risks that did lead to the loss’”), 
quoting Lentell v. Merrill Lynch & Co.
, 396 F.3d 161, 175 (2d Cir. 2005);
 In re Acterna Corp. Sec. Litig.
, 378 F. Supp. 2d. 561, 587 (D. Md. 2005) (showing that disclosure of alleged fraud caused loss is common method of proving loss causation)
.

Moreover, several legal commentators have concluded the 
Dura
 ruling does not preclude other methods of proving loss causation.  
See 
Madge S. Thorsen et al., 
Rediscovering the Economics of Loss Causation
, 6 J. Bus. & Sec. L. 93, 118 (2006) (“The Court did not say (or even imply) that ‘truth, then price drop’ was to become the only test of loss causation . . . .”); Merrit B. Fox,
 Understanding Dura
, 60 Bus. Law. 1547, 1552 (2005) (“The Court’s holding in 
Dura
 is extremely narrow . . . [and] does not specify what kinds of allegations and proofs would be sufficient to [show loss causation].”).  We agree and decline to adopt Qwest’s interpretation of 
Dura
.  Although a plaintiff must show a causal connection between a defendant’s alleged misrepresentations and a decline in share value, that causation need not depend on prior public disclosure of the defendant’s misrepresentations.

Rescission and the Tender Requirement

The Trust admits it is unable to tender its shares to Qwest because it has sold those shares.  It contends, however, that selling the shares to the market is sufficient tender under § 44-2001(A) and the common law, relying on 
In re Mego Financial Corp. Securities Litigation
, 213 F.3d 454 (9th Cir. 2000).  The trial court rejected this contention, stating the Trust “did not tender, cannot now, and should not be allowed ‘substitute tender.’” 

The Ninth Circuit in 
Mego
 stated:  “In an open market setting[,] the injured party ‘returns the stock’ by selling it on the open market.”  
Id.
 at 460.  The court, however, did not hold that a sale on the open market permits rescission.  Instead, it analyzed the appropriateness of rescissory damages in a class action lawsuit.  Therefore, at best,
 Mego
 stands for the proposition that rescissory damages may be available to the Trust, not that selling a security on the open market operates as actual tender.  Moreover, “open market” tender is contrary to Arizona law.  
See Jennings v. Lee
, 105 Ariz. 167, 171, 461 P.2d 161, 165 (1969) (“[A] party seeking to rescind a contract must restore or offer to restore to the other party that which he has received under the contract.”).  No Arizona law suggests that selling an item to an unknown third party is sufficient to meet the tender requirement.

The Trust also argues it should be permitted to obtain KPNQwest shares and  tender those “substitute shares [to] fulfill[] the tender requirement.”  The Trust relies primarily on 
Birch v. Arnold & Sears, Inc.
, 192 N.E. 591 (Mass. 1934), and 
Whittier v. Electric Refrigeration Corp.
, 224 N.W. 447 (Mich. 1929).
(footnote: 6)  The court in 
Birch 
stated:  “The plaintiff having sold some of the securities sold to her by the defendants without knowledge or reason to know of the defendants’ breach is entitled to rescind the contract not withstanding such sale.”  192 N.E. at 593-94.  The 
Birch 
court also placed the burden on the defendants to establish what credit, if any, they should be entitled to upon tender of the plaintiff’s stock of any profit she might make from its sale.  
Id.
 at 594.  The court in 
Whittier
 reached a similar result, holding a plaintiff who tendered shares “equivalent of all he had received” had met the tender requirement for rescission.  224 N.W. at 447.  
Whittier 
did not discuss any credit to the defendant for the value of the shares the plaintiff had sold.

The rule of 
Birch 
and 
Whittier
 is reflected in the Restatement of Restitution § 66(4) (1937), which states:  “A person who has received . . . fungible things and who is required to make restoration as a condition to restitution is entitled to substitute a like amount of such money or things in place of those which he has received.”  
See also 
9 Louis Loss & Joel Seligman, 
Securities Regulation
 4158 (3d ed. 2004) (“The courts in most jurisdictions are understandably reluctant to require restoration of the identical pieces of paper in the securities field.”). 

The language of § 44-2001(A) tracks the language of 15 U.S.C. § 77
l
(a); both statutes permit a plaintiff to bring an action “to recover the consideration paid for” a security upon tender of the security “or for damages” if the plaintiff “no longer owns” the security.  The Second Circuit, in 
Wigand v. Flo-Tek, Inc.
, 609 F.2d 1028, 1035 (2d Cir. 1979), determined that 15 U.S.C. § 77
l
(a) “is explicit in allowing the plaintiff no choice of remedy.  If plaintiff owns the stock, he is entitled to rescission but not damages.  If plaintiff no longer owns the stock, he is entitled to damages but not rescission.”  

The 
Wigand
 court decided the plaintiff’s ownership of shares at the time the action is filed determined which remedy applied.  609 F.2d at 1035.  
The
 
court, however, adopted this approach because the defendant there had attempted to cancel the plaintiff’s stock in order to force the damages remedy and thus require a showing of causation.  
Id.
  That scenario does not exist here.  Moreover, Arizona courts have viewed § 44-2001 as permitting a plaintiff to elect a remedy rather than as prescribing the remedy.  
See Baker v. Walston & Co.
, 7 Ariz. App. 590, 591 n.1, 442 P.2d 148, 149 n.1 (1968), 
disapproved on other grounds by Greenfield v. Cheek
, 122 Ariz. 57, 58, 593 P.2d 280, 281 (1979).  Thus, we are not persuaded to follow this portion of 
Wigand
.
(footnote: 7)  If a plaintiff owns identical shares by the time tender is required, rescission is available.
(footnote: 8)  Additionally, because 
Wigand 
interpreted the language of 15 U.S.C. § 77
l
(a), its interpretation has no bearing on the Trust’s common law claims or its claim under Arizona’s Consumer Fraud Act.

Qwest argues that permitting substitute tender would nullify the loss causation rule of A.R.S. § 44-2082(E) and “raise the specter of unlimited recover[y] of losses” without a showing of causation.  Substitute tender, however, does not affect the loss causation rules.  Rescission only undoes the transaction and is limited to “the consideration paid for the securities” reduced by the “amount of any income received by dividend or otherwise from ownership of the securities.” § 44-2001(A).  Therefore, a claim for rescission could not encompass compensatory or punitive damages.
(footnote: 9)
Nor would permitting substitute tender lead to unlimited liability.  First, Qwest’s scenario illustrating such liability is logically flawed; it assumes there is an unlimited supply of stock that a plaintiff can obtain for the purpose of making substitute tender.  In fact, a defendant would only have to return the consideration once for any outstanding share because the share would then be tendered to the defendant.  For example, Company A has 1,000 shares of outstanding stock and begins a fraudulent scheme.  During the time of the scheme, each share of stock is sold and bought twice.  Thus, there were 2,000 transactions during the time of the fraudulent scheme.  Even if substitute tender is permitted, however, Company A would only have to pay for the rescission of 1,000 shares because it would receive a share as tender for each rescission.  This result is the same as if a single plaintiff had purchased the 1,000 shares, held them for the duration of the fraudulent scheme, and then sued for rescission.

Moreover, A.R.S. § 44-1991(A)(1) and (3) broadly prohibit fraudulent schemes.  Thus, we see no injustice in requiring a defendant to return the consideration an unwitting purchaser paid for any securities sold during the course of such a scheme.  When the Arizona legislature enacted §§ 44-1991 and 44-2001, 1951 Ariz. Sess. Laws, ch. 18, §§ 15 and 17, as part of the Arizona Securities Act, 
id. 
§ 1, it described the purpose of the act as “the protection of the public, the preservation of fair and equitable business practices, [and] the suppression of fraudulent and deceptive practices in the sale or purchase of securities.” 
 Id.
 § 20.  That same section also requires that the Act “be liberally construed as a remedial measure in order not to defeat the purpose thereof.”  
Id.;
 
see also Siporin v. Carrington
, 200 Ariz. 97, ¶ 1, 23 P.3d 92, 93 (App. 2001)
 
(“By legislative design, the Arizona Securities Act protects the public by preventing dishonest promoters from selling financial schemes to unwary investors.”)
.  Although the Supreme Court in 
Dura
 cautioned that the securities laws are not meant “to provide investors with broad insurance against market losses,” 544 U.S. at 345, 125 S. Ct. at 1633, § 44-2001 creates a right for a plaintiff to rescind a transaction if the defendant has violated Arizona securities law.  Permitting substitute tender protects that right by preventing a defrauded shareholder from being denied rescission merely because he or she sold shares in an attempt to mitigate losses.

Qwest contends the plain language of § 44-2001(A) precludes tender of substitute shares because it requires “tender of the securities purchased.”  Equity securities, however, “are treated as fungible items.  ‘[Because] all shares of a corporation’s stock are alike and interchangeable, it is of no consequence whether those bought and sold are represented by the same certificates.’” 
 Ohio Drill & Tool Co. v. Johnson, 
498 F.2d 186, 194 (6th Cir. 1974), 
quoting Walet v. Jefferson Lake Sulphur Co.
, 202 F.2d 433, 434 (5th Cir. 1953); 
see also, e.g.,
 
Wash. Legal Found. v. Legal Found. of Wash.
, 271 F.3d 835, 878 (9th Cir. 2001) (“Unlike medieval England, most assets are now held in the form of fungible intangibles such as bank accounts, money market accounts, and securities.
”); 
Gail v. United States
, 58 F.3d 580, 585 n.7 (10th Cir. 1995) (“In the case of securities, for example, it is a simple thing to replace shares of stock because they are fungible—one share of . . . stock is as good as any other.
”).  Thus, any shares of KPNQwest stock the Trust obtains for tender would be, for all material purposes, indistinguishable from the shares originally purchased.
(footnote: 10)  Therefore, Qwest cannot fairly claim there is a material difference between the shares the Trust originally purchased and any shares it might obtain to use as substitute tender.  That KPNQwest shares may presently have little or no value is not relevant to the purpose of the tender requirement.
(footnote: 11)  Indeed, given the presumed value of KPNQwest stock, tender of the original shares is little more than a technical requirement.  That substitute tender here might well be a matter of form over substance is of little import.

Moreover, as noted above, § 44-2001(A) parallels the equitable remedy of rescission and, therefore, is meant to return the parties to the status quo.  
See Reed v. McLaws
, 56 Ariz. 556, 562-63, 110 P.2d 222, 225 (1941) (common law rescission meant to return parties to status quo).  Requiring a plaintiff to tender materially identical shares accomplishes this goal as effectively as requiring the plaintiff to tender the actual shares purchased during a defendant’s fraudulent scheme.
  And, as discussed above, the purpose of 
Arizona’s Securities Act is to protect the public, “preserve fair and equitable business practices,” and suppress “fraudulent and deceptive practices in the sale or purchase of securities.”  1951 Ariz. Sess. Laws, ch. 18, § 20. 
 To require a plaintiff to tender the actual shares purchased rather than identical shares does not further that purpose because, as we previously noted, it would unfairly penalize a defrauded purchaser who sold those shares in an effort to mitigate damages.  Accordingly, we will not interpret § 44-2001 to require tender of the actual securities purchased during the fraudulent scheme and conclude it instead requires the tender of equivalent shares.
(footnote: 12)  
See 
1951 Ariz. Sess. Laws, ch. 18, § 20
 (mandating liberal interpretation of Arizona Securities Act).

Arizona courts have generally not required tender until the beginning of trial.  
See Rose v. Dobras
, 128 Ariz. 209, 214, 624 P.2d 887, 892 (App. 1981); 
Bullard v. Garvin
, 1 Ariz. App. 249, 251, 401 P.2d 417, 419 (1965).
(footnote: 13)  Thus, we conclude that, if it can obtain substitute shares of KPNQwest stock and tender it to Qwest before trial, the Trust may seek rescission of the original sale under § 44-2001 and its common law and consumer fraud claims.  The trial court abused its discretion by concluding otherwise.

Rescission and the Loss Causation Requirement

Qwest contended at oral argument that, even if the Trust could make adequate tender, it still must prove loss causation for its statutory rescission claims.  The Trust argues that Qwest has conceded this issue.  Assuming, arguendo, that Qwest did not concede this issue, we nonetheless find its position unsupported by Arizona’s statutory scheme.

Arizona’s loss causation requirement is contained in A.R.S. § 44-2082(E), which places the burden on the plaintiff to prove “that the act or omission of the defendant alleged to violate the section under which the private action is brought caused the loss for which the plaintiff seeks to recover damages.”  As noted previously, however, rescission is not a measure of damages. 
 Standard Chartered PLC v. Price Waterhouse
, 190 Ariz. 6, 34, 945 P.2d 317, 345 (App. 1996)
.  This clearly suggests to us that § 44-2082(E) does not apply to a rescission claim.  Moreover, the loss causation affirmative defense provided in § 44-1991(B) refers not to “damages” but to “the amount recoverable.”
(footnote: 14)  This difference in language shows the legislature’s intent to distinguish between a claim for damages and a claim for rescission.  Thus, under Arizona law, a plaintiff who proves a violation of § 44-1991(A)(1) or (3) may rescind the sale, despite having suffered no loss.

At oral argument, Qwest also reasoned that, because federal law requires a showing of loss causation for rescission claims, we should similarly interpret Arizona’s statutory scheme.  The cases Qwest urged in support, however, do not stand for that proposition.  Those cases address claims for rescissory damages, not rescission in which the plaintiff tenders equivalent shares. 
 
Moreover, the claims at issue in those cases involved the cause of action federal courts have 
implied from 
15 U.S.C. § 78j(b)
 
and 17 C.F.R. § 240.10b-5 (2006).
  
See 
Mathews v. Kidder, Peabody & Co.
,  260 F.3d 239, 249-50 (3d Cir. 2001)
; 
Hoxworth v. Blinder, Robinson & Co.
, 903 F.2d 186, 203 n.25 (3d Cir. 1990)
; 
Huddleston v. Herman & MacLean
,
 
640 F.2d 534, 555 (5th Cir. 1981), 
reversed in part
, 459 U.S. 375, 390-91, 103 S. Ct. 683, 692 (1983)
; 
s
ee also Dura
, 544 U.S. at 341, 125 S. Ct. at 1630-31 (describing implied private action).
  Unlike the Arizona scheme, 
see
 § 44-2001(A), the federal statutes contain no explicit rescission remedy.  
The federal statutory rescission remedy is limited to claims brought under 15 U.S.C. §77
l
.  As discussed above, the contrasting plain language of Arizona’s statutory scheme permits rescission in an action brought pursuant to § 44-1991(A)(1) or (3) without showing damages and, therefore, without demonstrating causation. 

Qwest further contended at oral argument that the Trust must show causation to obtain rescission on its common law claims.  Although some commentators suggest a rescission claim should be offset by the property’s depreciation “due to factors not associated with the defendant’s representations,” 2 Dan B. Dobbs, 
Law of Remedies
 § 9.3(3), at 588 (2d ed. 1993), we find no Arizona case adopting this approach.  
Moreover, Dobbs suggests that the “‘proximate cause’ limitation” 
on rescission may be inappropriate if “the defendant’s intentional fraud can be understood as inducing a transaction that the plaintiff would not have entered at any price if he had known the truth.”  
Id
. at 589; 
see also 
1 George E. Palmer, 
Law of Restitution 
§ 3.12, at 307-08 (1978) (“When rescission is based upon innocent misrepresentation, breach of contract, or mistake, it may be fair to put the risk on the purchaser, but it does not follow that the property should be at his risk when he was induced to purchase it by the other’s fraud.”).  We see no reason to adopt a proximate cause rule for rescission where, as is alleged here, the plaintiff was induced to enter the transaction by the defendant’s fraud.  To the extent the trial court’s ruling requires such a showing, the court abused its discretion in doing so.

Claims under § 44-1991(A)(1) and (3) and the Loss Causation Requirement

The Trust also brought claims pursuant to A.R.S. § 44-1991(A)(1), which prohibits “any device, scheme or artifice to defraud,” and (A)(3), which proscribes “any transaction, practice or course of business which operates or would operate as a fraud or deceit.”  The Trust asserts A.R.S. § 44-2082(E) does not apply to these claims.  As noted in ¶ 50 above, that statute requires a plaintiff to prove “that the act or omission of the defendant alleged to violate the section under which the private action is brought caused the loss for which the plaintiff seeks to recover damages.”  
Id
.

The plain language of § 44-2082(E), however, belies the Trust’s argument.  That section states it applies to “any private action arising under this chapter” other than as provided in § 44-1991(B).  Subsection 44-1991(B) permits a defendant to prove a lack of loss causation as an affirmative defense to any action brought under § 44-1991(A)(2), which prohibits false statements or omissions of material facts.  
Subsection (B) does not discuss subsections (A)(1) or (3).  A statute’s language is “the best and most reliable index of its meaning.”  
Arpaio v. Steinle
, 201 Ariz. 353, ¶ 5, 35 P.3d 114, 116 (App. 2001).  “If the statute’s language is clear and unambiguous, we give effect to that language and apply it without using other means of statutory construction.” 
 Id.

The Trust argues “there is no reason to think that the legislature would have limited [§ 44-1991(B)] to just [(A)(2)] had it wanted a broader loss causation provision for  [the entire statute],” reasoning the legislature would have specified a loss causation requirement for § 44-1991(A)(1) and (3) claims in subsection (B) had it intended one to apply.  We disagree; the legislature provided a loss causation requirement for § 44-1991(A)(1) and (3) in § 44-2082(E).  There would have been no reason for it to add an identical requirement in § 44-1991 when it had already prescribed the requirement in § 44-2082(E).  Moreover, § 44-2082(E) explicitly excludes § 44-1991(B) and, therefore, its subsection (A)(2) from its scope; had the legislature intended to exclude subsections (A)(1) and (3) as well, it would have done so, either in § 44-2082(E) or in § 44-1991. 
 See, e.g.
, A.R.S. §§ 44-1998(B), 44-1997(F) (specifying loss causation as affirmative defense); 
see also City of Phoenix v. Superior Court
, 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984) (“[S]pecific statutory provisions will usually control over those that are general.”).  Thus, the intent of the legislature is clear; a plaintiff need not show loss causation for a claim under § 44-1991(A)(2).  Instead, the defendant may assert a lack of loss causation as an affirmative defense.  For all other claims for damages in Title 44, chapter 12, the plaintiff must prove loss causation unless the statute governing that claim specifies otherwise.

The Trust next argues that requiring proof of loss causation for actions under § 44-1991(A)(1) or (3) would “violate the rules of interpretation mandating the harmonization of statutes, the avoidance of conflict or the creation of redundancies, and the rendering of clauses ineffective.”  To support this argument, it points out that imposing the loss causation requirement of § 44-2082(E) “would create two different kinds of loss causation within the same statute—affirmative defense loss causation for (A)(2), and plaintiff proof of loss for [(A)(1) and (3)].”  The Trust reasons the application of § 44-2082(E) to § 44-1991 “create[s] redundancy because there is no principled basis to say that [§ 44-2082(E)] applies only to [§ 44-1991(A)(1) and (3)].”  Thus, it concludes, both § 44-2082(E) and § 44-1991(B) must apply to § 44-1991(A)(2), creating a conflict, or § 44-2082(E) renders § 44-1991(B) ineffective by “supplant[ing]” it.  

This argument misapprehends the statutory scheme.  Subsection 44-1991(B) creates an exception to § 44-2082(E) that applies to § 44-1991(A)(2).  This result creates neither redundancy nor conflict because the exception created by § 44-1991(B) trumps the broader rule of § 44-2082(E).  
See City of Phoenix
, 139 Ariz. at 178, 677 P.2d at 1286 (specific provisions control over general).  Nor does it render any portion of either statute ineffective.  The subsubsections of § 44-1991(A) address different violations, and it is not unreasonable for the legislature to require different proof for each.  

Additionally, the loss causation requirements of the Arizona securities statutes closely mirror the federal scheme.  Section 44-1991(A)(2) and its federal counterpart, 15 U.S.C. § 77
l
, both prohibit misstatements and misleading omissions.  Both statutes also place the burden on the defendant to prove a lack of loss causation as an affirmative defense. 
 
§ 44-1991(B); 15 U.S.C. § 77
l
(b).  

Conversely, §§ 44-1991(A)(1) and (3) and 44-2001 reflect the private cause of action federal courts have implied from 
15 U.S.C. § 78j(b)
 
and 17 C.F.R. § 240.10b-5 (2006).
  See Dura
, 544 U.S. at 341, 125 S. Ct. at 1630-31 (describing implied private action).  Those sections “police a wider range of fraud” than § 44-1991(A)(2) and 15 U.S.C. § 77
l
, “broadly prohibiting all deception by schemes, artifices and misleading practices.”  Richard G. Himelrick, 
Arizona Securities Fraud Liability:  Charting a Non-Federal Path
, 32 Ariz. St. L.J. 203, 215 (2000).  Section 78u-4(b)(4) of 15 U.S.C. requires a plaintiff to prove loss causation in a cause of action brought under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, just as § 44-2082(E) requires a plaintiff to do so for an action brought under § 44-1991(A)(1) or (3).

The Trust’s argument that Arizona has departed from the federal scheme of loss causation is not convincing.  The Trust argues the title of § 44-2082—“Requirements for securities fraud actions involving misleading statements or omissions”—suggests the statute does not apply to § 44-1991(A)(1) and (3) because those provisions deal with “fraud scheme” or “artifice to defraud” violations, not with misleading statements or omissions.  Although we may consider the title of a statute in determining the legislature’s intent in enacting that statute, it is only appropriate to do so to resolve ambiguity.  
State ex rel. Romley v. Hauser
, 209 Ariz. 539, ¶ 16, 105 P.3d 1158, 1161 (2005); 
see also
 A.R.S.
 
§ 1-212 (“[H]eadings to sections . . . do not constitute part of the law.”).  As noted above, we find no ambiguity in the statutory language; thus, we do not consider the statute’s title as evidence the legislature intended to permit a plaintiff to recover damages without establishing causation.

Rescissory Damages and the Loss Causation Requirement

The Trust contends that, to recover rescissory damages, it need not prove a causal link between those damages and Qwest’s alleged misrepresentations.  It argues the purpose of rescission is to void the transaction, and the “remedial and deterrence goals of common law and statutory rescission” permit courts “the necessary flexibility” to accomplish that end. 

Although we agree the common law provides courts flexibility in crafting a rescission remedy, Arizona’s statutory scheme may not be so malleable. 
“[A] statute’s language [i]s the best and most reliable index of its meaning.
”  
Arpaio v. Steinle
, 201 Ariz. 353, ¶ 5, 35 P.3d 114, 116 (App. 2001).
  Under §  44-2001(A), if a plaintiff  “no longer owns the securities,” his or her only recourse is to bring an action for damages.  As discussed above, § 44-2082(E) requires any plaintiff who brings an action to “recover damages” for a violation of § 44-1991(A)(1) or (3) to prove “that the act or omission of the defendant alleged to violate the section under which the private action is brought caused the loss.”  To permit a plaintiff to recover rescissory damages when he or she “no longer owns the securities” without applying the causation requirements of § 44-2082(E) would directly contravene the language of those statutes.  

The Trust argues that § 44-2001(A) “authorizes common law rescission as a remedy for securities fraud” and reasons that interpreting § 44-2082(E) to require a plaintiff to show loss causation to recover rescissory damages is an improper implied repeal of that remedy.  Section 44-2001(A), however, is silent on the question of proof of causation; it merely permits a plaintiff who cannot tender the purchased shares to sue for damages.  The Trust cites no authority, and we find none, suggesting that rescissory damages were available under § 44-2001(A) without a showing of causation before § 44-2082 was enacted.  Nor does it cite any authority suggesting rescissory damages are available under the common law without showing proximate cause.  Recovery of damages typically requires a showing of proximate cause.  
See Valley Nat’l Bank v. Brown
, 110 Ariz. 260, 264, 517 P.2d 1256, 1260 (1974) (“Recovery in a tort action is limited to those damages which are the direct and proximate consequence of the defendant’s wrongful acts.”);
 see also Movitz v. First Nat’l Bank of Chicago
, 148 F.3d 760, 763 (7th Cir. 1998) (“The requirement of proving loss causation is a general requirement of tort law.”).  We conclude the legislature’s decision to explicitly require a showing of proximate cause in a claim for damages under § 44-2001(A) did not act as an implied repeal of any statute, nor did it abrogate any common law remedy.

As noted above, however, common law rescission is less strict than rescission under §§ 44-2001(A) and 44-2082(E).  Although the purpose of rescission is to return both parties to the status quo, 
see Reed v. McLaws
, 56 Ariz. 556, 563, 110 P.2d 222, 225 (1941), “equitable considerations [may] obviate the need for the status quo relationship.”  
Bank One, Texas v. Stewart
, 967 S.W.2d 419, 455 (Tex. App. 1998); 
see also Jennings v. Lee
, 105 Ariz. 167, 172, 461 P.2d 161, 166 (1969) (strict adherence to tender requirement not necessary “where to do so would lead to inequitable results”); 
Webb v. Webb
, 431 S.E.2d 55, 62 (Va. Ct. App. 1993) (“‘Absolute and literal restoration is not required. Restoration that is reasonably possible and demanded by the equities of the case is enough.’”), 
quoting
 
Edmunds v. Chandler
, 127 S.E.2d 73, 78 (Va. 1962)
.  For example, an inability to tender property does not prevent rescission “when the defendant is directly responsible for plaintiff’s inability to return the subject matter of the rescinded contract,” 
Jennings
, 105 Ariz. at 172, 461 P.2d at 166, or when the subject matter of the contract is worthless, 
Graham v. Cook
, 347 S.E.2d 623, 624 (Ga. Ct. App. 1986); 
see also In re Leary
, 241 B.R. 266, 270 (D. Mass. 1999) (“[The tender] rule is subject to the exception that . . . tender . . . is not required if what was obtained was worthless.”).

Rescissory damages are intended to be the financial equivalent of the traditional rescission remedy, and such damages are available when tender is “impossible or infeasible.”  
Standard Chartered PLC v. Price Waterhouse
, 190 Ariz. 6, 34, 945 P.2d 317, 345 (App. 1996).  We conclude that whether a plaintiff seeking rescissory damages must show proximate cause depends on the equitable considerations discussed above.  If tender would not be required for equitable reasons, there is no need for a plaintiff to prove proximate cause to obtain rescissory damages.  If tender is possible, proof of proximate cause is not required for traditional rescission relief.  
See Lehnhardt v. City of Phoenix
, 105 Ariz. 142, 144, 460 P.2d 637, 639 (1969) (damages not element of misrepresentation rescission claim); 
Aaron v. Fromkin
, 196 Ariz. 224, ¶ 20, 994 P.2d 1039, 1043 (App. 2000) (“[D]amage is not an element of securities fraud.”).
 
 Therefore, if the Trust shows a sufficient equitable reason for having the tender requirement waived, it need not prove proximate cause to obtain rescissory damages for its common law and consumer fraud claims.  Possibilities might be that the KPNQwest stock is currently worthless or that the Trust sold the stock as a direct result of Qwest’s actions.  This rule is particularly appropriate here because the Trust’s prior sale of the securities may serve to reduce the amount for which Qwest may be liable.  Again, the trial court abused its discretion by concluding the Trust was required to show causation to obtain rescissory damages.

Common Law and Consumer Fraud Claims and the Loss Causation Requirement

The Trust’s complaint alleged common law claims for breach of fiduciary duty and fraudulent misrepresentation and a consumer fraud claim under A.R.S. §§ 44-1521 through 44-1534.  The Trust asserts the trial court erred by “importing statutory securities loss causation into” these claims and “in granting summary judgment before [it] could develop a record on proximate causation.”

The Trust argues 
Dura
 is inapplicable to its common law and consumer fraud claims because it is “a very narrow decision on a matter of federal securities law.”  As discussed above, however, 
Dura
 does not significantly restrict the means by which a plaintiff can show proximate cause; it only clarifies that merely alleging an inflated purchase price is insufficient to do so.   544 U.S. at 342, 125 S. Ct. at 1631.  The 
Dura 
Court also noted that “[j]udicially implied private securities-fraud actions resemble . . . common-law deceit and misrepresentation actions.”  
Id.
 at 343, 125 S. Ct. at 1632.  The reasoning of 
Dura,
 therefore, is equally applicable to any securities claim, be it statutory or based in the common law, because any such claim for damages requires a showing of proximate cause.

Although it appears the trial court may have misinterpreted 
Dura
 in grounding its ruling
,
(footnote: 15) the Trust concedes it must show proximate cause to obtain damages on its common law and consumer fraud claims.
(footnote: 16)  
The Trust does not argue it can show proximate cause on the current record but, instead, contends it requires further discovery.
 

The Trust asserts that the trial court had directed discovery “toward 
Dura-
type loss causation” and that the Trust “pressed upon the [trial] Court [its] position that under the existing restrictive discovery conditions [it] could not provide a customary Rule 56(f)[, Ariz. R. Civ. P, 16 A.R.S., Pt. 2,] affidavit to support [its] contention that [it] could present a jury question on proximate cause.”  If a party opposing a motion for summary judgment “cannot . . . present by affidavit facts essential to justify the party’s opposition,” then that party may request a continuance pursuant to Rule 56(f).

Although we agree discovery was not complete, we find nothing in the record that shows discovery was limited to facts concerning Qwest’s interpretation of 
Dura
.  In the quotation the Trust provided to support this assertion, the trial court did not refer to Qwest’s motion for partial summary judgment, but discussed further discovery for a motion not at issue here.
(footnote: 17) 

Further, the Trust’s response to Qwest’s motion for partial summary judgment did not refer to Rule 56(f) and stated only that, “[g]iven the posture of this case, we cannot yet submit all the facts we intend to prove in the form of admissible evidence, but our accompanying separate fact statement will demonstrate that our proof expectations are reasonably based.”  The Trust also provided “a brief summary of [those] expectations” that contained no citations to the accompanying statement of facts.  In the statement of facts, the Trust asserted it was “impossible to comply with the technical requirements of Rule 56(f) in the absence of a discovery schedule,” and it would be “premature to attempt detail about which witnesses and other sources will provide expected evidence.”  

The trial court asked the Trust about a Rule 56(f) affidavit at the hearing on the summary judgment motion and commented in its ruling that the Trust had not filed one.  A valid motion under Rule 56(f) requires a party to submit a sworn statement specifically describing the reasons justifying delay, 
Magellan South Mountain Ltd. Partnership v. Maricopa County
, 192 Ariz. 499, ¶ 10, 968 P.2d 103, 106 (App. 1998), including “(1) the particular evidence beyond the party’s control; (2) the location of the evidence; (3) what the party believes the evidence will reveal; (4) the methods to be used to obtain it; and (5) an estimate of the amount of time the additional discovery will require,” 
id.
 ¶ 8.  Nothing in the statement of facts accompanying the Trust’s response to the motion for summary judgment met these requirements.  Additionally, the Trust cites no authority suggesting it did not have to file a Rule 56(f) affidavit in these circumstances.  

Moreover, at the hearing, the trial court discussed several means by which the Trust could show proximate cause and asked if the Trust had affidavits to support those means.  The Trust admitted it did not.  Rather than requesting leave to file a Rule 56(f) affidavit, it instead asserted it could later show proximate cause “if it comes to that point.”  Thus, not only did the Trust fail to file an appropriate Rule 56(f) affidavit with its response to Qwest’s motion, it also failed to request leave to file one when invited to do so.  Consequently, we conclude the court did not abuse its discretion in ruling on the motion for summary judgment without permitting the Trust to conduct more discovery.  
See, e.g., Maricopa County v. Kinko’s Inc.
, 203 Ariz. 496, ¶ 19, 56 P.3d 70, 75 (App. 2002) (“We apply an abuse of discretion standard of review to a denial of relief under Rule 56(f).”).

Disposition

We accept special action jurisdiction and grant partial relief.  We affirm the trial court’s grant of summary judgment in favor of Qwest on the Trust’s claims for damages but reverse summary judgment on the rescission claims.  The Trust has requested attorney fees pursuant to A.R.S. § 12-341.01.
(footnote: 18)  In our discretion, we decline to award fees, without prejudice to a request in the trial court after a decision on the merits.  

                                                                        

J. WILLIAM BRAMMER, JR., Judge

CONCURRING:

                                                                           

PETER J. ECKERSTROM, Presiding Judge

                                                                           

PHILIP G. ESPINOSA, Judge

FOOTNOTES
1:
Courts use the terms “rescissory damages” and “rescissionary damages” interchangeably.  
See Standard Chartered PLC v. Price Waterhouse
, 190 Ariz. 6, 34, 945 P.2d 317, 345 (App. 1996) (“rescissory damages”); 
Rosier v. First Fin. Capital Corp.
, 181 Ariz. 218, 220, 889 P.2d 11, 13 (App. 1994) (“rescissionary  damages”).

2:
The Trust does not appeal from the trial court’s grant of Qwest’s motion for partial summary judgment on its federal claims or its claims under A.R.S. §§ 44-1997 and 44-1998.

3:
Rule 54(b), Ariz. R. Civ. P., 16 A.R.S., Pt. 2, states in relevant part that, “[w]
hen more than one claim for relief is presented in an action,” a trial court “may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.”

4:
As is the practice in this division of the court of appeals, one member of the panel scheduled to hear the argument prepares a draft decision, subject to revision after argument and conference, that is disseminated to counsel for the parties, and the other panel members, in advance of argument.

5:
Rescission is also available as a remedy for the Trust’s fraudulent concealment claim.  
See 
Restatement (Second) of Torts § 550 (1977) (same liability for fraudulent concealment and misrepresentation); Restatement (Second) of Torts § 549 cmt. e (1977) (“One who is misled by the fraudulent representations of another may rescind the transaction induced by it.”); 
see also Lehnhardt v. City of Phoenix
, 105 Ariz. 142, 144, 460 P.2d 637, 639 (1969) (damages are not element of rescission claim based on misrepresentation).  The Trust’s claims for breach of fiduciary duty and consumer fraud are also based on fraudulent statements by Qwest.  And Qwest does not argue rescission is unavailable for these claims, provided the Trust meets the tender requirement. 

6:
The Trust also cites 
Sher v. Sandler
, 90 N.E.2d 536 (Mass. 1950), but this case did not address the tender of shares by a plaintiff in an attempt to rescind a contract.  Instead, the defendant was required to provide substitute shares as a measure of damages.

7:
At oral argument, Qwest cited two cases that, it asserted, suggested we should adopt the rule of 
Wigand v. Flo-Tek, Inc.
, 609 F.2d 1028, 1035 (2d Cir. 1979).  Neither case, however, provided any analysis of the reasoning of 
Wigand 
nor discussed its rule that the date an action is filed fixes the plaintiff’s remedy.  
See 
Commercial Union Assurance Co. v. Milken
, 17 F.3d 608, 615 (2d. Cir. 1994); 
Royal Am. Managers, Inc. v. IRC Holding Corp.
, 885 F.2d 1011, 1019 n.4 (2d Cir. 1989).  Another case Qwest cited, 
Mott v. Tri-Continental Financial Corp.
, 330 F.2d 468, 471 (2d Cir. 1964)
, preceded 
Wigand
, but did not hold that a plaintiff’s remedy is determined as of the date the action is filed.

8:
The Supreme Court partially adopted the rule in 
Wigand
 in 
Randall v. Loftsgaarden
, 478 U.S. 647, 655, 106 S. Ct. 3143, 3149 (1986), stating that the federal statute “prescribes the remedy of rescission except where the plaintiff no longer owns the security.”  Thus, under 
Randall
, a plaintiff must seek rescission if the security is still owned.  
Randall
, however, did not explicitly adopt the portion of 
Wigand
 governing when the rule takes effect.

9:
Although 
Washington National Corp. v. Thomas
, 117 Ariz. 95, 103, 570 P.2d 1268, 1276 (App. 1977), 
disapproved on other grounds by Greenfield v. Cheek
, 122 Ariz. 57, 58, 593 P.2d 280, 281 (1979), suggests both rescission and damages may be available “where rescission alone will not adequately compensate the plaintiff,” nothing in that opinion suggests damages would be available without a showing of proximate cause.

10:
Nothing in the record suggests the shares of KPNQwest stock the Trust purchased were specifically identifiable or were in any way materially different from any other KPNQwest shares of the same class.

11:
We find nothing in the record that shows the current value of KPNQwest stock.  The Trust asserted in its motion titled “Rescission for Securities Claims” that KPNQwest stock is still traded in Europe at “minuscule share prices.” 

12:
Our conclusion does not require us to determine which party would bear the burden of proving whether the shares tendered were the actual shares purchased during the fraudulent scheme.  As the parties admitted at oral argument, that burden could be extremely difficult, if not impossible, for either party to meet.

13:
Rose v. Dobras
, 128 Ariz. 209, 214, 624 P.2d 887, 892 (App. 1981), suggests tender at the beginning of trial may be insufficient if there is evidence a plaintiff “delayed in electing the remedy of rescission to see if avoidance or affirmance would be more profitable.”  Nothing in the record suggests deliberate delay by the Trust.

14:
The loss causation affirmative defense in A.R.S. § 44-1991(B) applies only to claims brought pursuant to § 44-1991(A)(2), not to claims brought under § 44-1991(A)(1) or (3).

15:
The Trust does not contend the trial court’s misinterpretation of 
Dura
 requires reversal of summary judgment on its claims under § 44-1991(A)(1) and (3).  Nor does it argue that the grant of summary judgment on those claims was premature.  It instead limits its argument to whether it was required to show loss causation on those claims.  Accordingly, in this section, we only address the propriety of summary judgment on the Trust’s common law and consumer fraud claims.

16:
See Dillon v. Zeneca Corp.
, 202 Ariz. 167, ¶ 13, 42 P.3d 598, 603 (App. 2002) (showing proximate injury required for claim of fraudulent misrepresentation);
 AMERCO v. Shoen, 
184 Ariz. 150, 156, 907 P.2d 536, 542 (App. 1995) (action for breach of fiduciary duty requires showing causation of damages);
 Dunlap v. Jimmy GMC of Tucson, Inc.
, 136 Ariz. 338, 342, 666 P.2d 83, 87 (App. 1983) (element of consumer fraud action is showing of “consequent and proximate injury”)
.

17:
The trial court instructed the Trust to cooperate with Qwest “in stipulating and/or producing limited, necessary[/]appropriate documents and/or facts associated with the motion.”   The motion the trial court referred to was Qwest’s motion for partial summary judgment claiming the Arizona statutes do not apply because the transactions did not occur “within or from” Arizona, not the motion addressing 
Dura
.  The Trust mischaracterized this quote in its opening brief as referring to 
Qwest’s 
Dura
 motion.

18:
The Trust also requests fees under the Arizona Securities Act.  We presume the Trust refers to A.R.S. § 44-2001, which allows an award of attorney fees when a plaintiff proves a violation of Arizona securities law encompassed by that statute.  The Trust has not done so; therefore, its request is denied.

COMMENTS AND ANNOTATIONS
Text Box 1:
Text Box 2:

TEXT BOXES
NOV 24 2006

OCT 01 2004

FILED BY CLERK

COURT OF APPEALS

DIVISION TWO